[No. A033589. First Dist., Div. One. Apr. 13, 1987.]

C. V. STARR & COMPANY, Plaintiff and Respondent, v.
BOSTON REINSURANCE CORPORATION et al., Defendants and
Appellants.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication with the exception of parts I and II.

**COUNSEL**

Jerome N. Lerch, Louis H. Castoria, Dana Dumas Sankary and Wilson, Elser, Moskowitz, Edelman & Dicker for Defendants and Appellants.

Linda M. Lasley, Patricia Winters and Buchalter, Nemer, Fields, Chrystie & Younger for Plaintiff and Respondent.

**OPINION**

**RACANELLI, P. J.**—On this appeal from an order denying a petition to compel arbitration, we affirm for the reasons which follow.

## Procedural/Factual Background

In 1974 Elmer Fox & Company (Fox), a Denver-based accounting firm, obtained a $10 million professional liability insurance policy from Lloyds of London. In 1981 Fox obtained two policies of "excess" professional liability insurance from Granite State Insurance Company (Granite).

The first Granite policy provided $10 million in coverage in excess of the underlying primary Lloyds's policy. The second Granite policy provided $10 million in coverage in excess of the underlying $20 million coverage (i.e., $10 million from Lloyds and $10 million from the first Granite policy).

At the same time that Granite issued the excess coverage policies to Fox, Granite also obtained reinsurance from various insurers: nine carriers covered $8.5 million of the $10 million coverage of the first Granite policy, and six carriers covered $8.35 million of the $10 million coverage of the second Granite policy.

In 1983, 16 lawsuits were filed against Fox alleging professional misconduct with total claims exceeding $250 million. Plaintiffs in those lawsuits collectively asserted that Fox's insurance coverage was available for this amount on the theory that the lawsuits were separate claims commenced in three separate policy years thus triggering separate coverage. Eventually, the lawsuits were settled with payment of $19 million by Lloyds and $24.9 million by Granite.

A dispute arose among Granite's reinsurers as to the allocation of the $24.9 million payment. C. V. Starr & Company (Starr), Granite's underwriting manager and assignee, allocated half ($12.45 million) to the reinsurers of the first Granite policy and half to the reinsurers of the second Granite policy, some of the latter group objecting that the first group was liable for a greater portion.

On April 9, 1985, a meeting was held, attended by representatives from Starr and the various reinsurers, in an attempt to reach agreement concerning allocation. When no agreement was reached, Starr filed suit for breach of the reinsurance contracts and for declaratory relief seeking a judicial determination of the question of allocation among the first and second groups of excess reinsurers.[1]

Two of the eleven reinsurers named as defendants, Gerling Global Rein-

---

[1] In fact, the lawsuit was filed before the meeting, but Starr delayed serving the complaint until after the meeting.

surance Corporation (Gerling) and Boston Reinsurance Corporation (Boston), moved to stay or dismiss the lawsuit on the ground that the dispute was subject to arbitration. The trial court deemed the motion as a petition to compel arbitration. As to Gerling, the certificate of reinsurance contained a clause providing for arbitration "[s]hould an irreconcilable difference of opinion arise as to the interpretation of this Certificate . . . ." As to Boston, the certificate of reinsurance contained no arbitration clause; but at the meeting of April 9, 1985, a representative from Starr announced that it would agree to arbitration by a single umpire if the *reinsurers* responded by April 22. On April 22, Boston sent a telex message to Starr stating, "[W]e will agree to a simplified arbitration following the lines outlined at our last meeting. . . ."

Starr opposed the petition to compel arbitration on three grounds: 1) as to Gerling, that the arbitration clause applied only to disputes between Gerling and Granite over interpretation of the reinsurance contract, as distinguished from the present dispute between the first and second groups of reinsurers over allocation of the settlement payment; 2) as to Boston, no agreement to arbitrate existed since Starr's offer to arbitrate was conditioned upon acceptance by *all* the reinsurers; and 3) even if a valid arbitration agreement was shown, arbitration should be denied because of the possibility of conflicting rulings.

Gerling and Boston now appeal the trial court's order denying the petition to compel arbitration.

*Discussion*

I., II.*

. . . . . . . . . . . . . . . . . . . .

III

*Conflicting Rulings*

██ Starr also contends that the trial court's ruling with respect to Gerling is supportable on the ground that arbitration of Gerling's dispute with Starr could lead to conflicting rulings on common issues. We agree.

██ Code of Civil Procedure section 1281.2,[2] upon which the trial court

---

*See footnote, *ante,* page 1637.

[2]Unless otherwise indicated, all further statutory references are to this code.

relied,[3] provides in pertinent part: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that:

" . . . . . . . . . . . . . . . . . . .

"(c) A party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same transaction or series of related transactions and *there is a possibility of conflicting rulings on a common issue of law or fact.*" (Italics added.)

The controversy concerned the proper allocation of the $24.9 million settlement among the 11 reinsurance carriers,[4] only 1 of which is presently subject to arbitration.[5] Thus, the remaining allocation disputes will presumably be determined by court action.

The potential for conflicting rulings is readily apparent. Thus, for example, if the arbitrators found Gerling responsible for 5 percent of the settlement (10 percent of the half allocated to the second group),[6] the court still might find the remaining second reinsurers responsible for less than half of the settlement, in which case Starr would be overindemnified. Or, alternatively, if the arbitrators were to find Gerling responsible for *less* than 5 percent while the court found the second reinsurers responsible for half the settlement, then, in that event, Starr would not be fully indemnified. The very nature of the controversy here fully supports the trial court's decision to deny the request for arbitration.

---

[3]The parties are in apparent accord that section 1281.2 applies in the present case, rather than the Federal Arbitration Act (9 U.S.C. § 2) pertaining to agreements involving interstate commerce.

[4]In essence, the second group of reinsurers assert that equal allocation between the two groups is wrong, and that the settlement payment should be apportioned to each of the Granite policies in order, exhausting the limits of one policy before any allocation to the next, viz:
$10 million to first reinsurers
$10 million to second reinsurers
$ 4.9 million to first reinsurers
$24.9 million.

[5]Although other reinsurance carriers had arbitration clauses in their contracts, none, other than Gerling, sought arbitration.

[6]Gerling provided reinsurance in the amount of $1 million toward the $10 million second excess insurance policy (excess of the underlying $20 million). Thus, when Starr apportioned the $24.9 million settlement, it allocated $1.245 million, 5 percent of the total (or 10 percent of the half allocated to the second reinsurers) to Gerling.

Nonetheless, Gerling argues that the trial court could have obviated the possibility of conflicting rulings by staying the court action until arbitration was completed and then taken the Gerling arbitration award into account when deciding allocation among the others. But the potential result of the suggested procedure would be to give the arbitrators' decision binding effect on all the other reinsurers as well, even though, of course, they are not legally bound to arbitrate.

 The optimal procedure in the present case seems to be a single proceeding bringing together all the affected parties for an orderly decision on the allocations of each reinsurer. Section 1281.2, subdivision (c), expressly authorizes the trial court to proceed in that manner. "If the court determines that a party to the arbitration is also a party to litigation in a pending court action or special proceeding with a third party as set forth under subdivision (c) herein, the court (1) *may refuse to enforce the arbitration agreement and may order intervention or joinder of all parties in a single action* or special proceeding; . . ." (Italics added.)

Gerling argues that the trial court's decision to deny arbitration runs counter to the strong California policy favoring arbitration.[7] But Gerling overlooks the equally compelling argument that the Legislature has also authorized trial courts to refuse enforcement of an arbitration agreement when, as here, there is a possibility of conflicting rulings. (§ 1281.2, subd. (c).)

In this respect, Gerling's reliance on *Dean Witter Reynolds, Inc.* v. *Byrd* (1985) 470 U.S. 213 [84 L.Ed.2d 158, 105 S.Ct. 1238], is misplaced. There, the Supreme Court held that under the Federal Arbitration Act (9 U.S.C. § 2), arbitration may not be denied simply because some causes of action are arbitrable and some are not, even if the result is "piecemeal" litigation. Nor can Gerling take comfort from *Moses H. Cone Hospital* v. *Mercury Constr. Corp.* (1983) 460 U.S. 1, 20 [74 L.Ed.2d 765, 782, 103 S.Ct. 927], in which the court held that under the Federal Arbitration Act "an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement."

Those decisions relied upon the language of the federal act (9 U.S.C. § 2), which—though paralleling the language of section 1281[8]—contains no

---

[7]This court has long recognized the public policy reflected in the statutory scheme in favor of voluntary arbitration agreements. (See *Crofoot* v. *Blair Holdings Corp.*, (1953) 119 Cal.App.2d 156, 183-184 [260 P.2d 156], disapproved on other grounds in *Posner* v. *Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169 [14 Cal.Rptr. 297, 363 P.2d 313].)

[8]The Federal Arbitration Act provides that an arbitration agreement involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.)

Section 1281 similarly provides that an arbitration agreement "is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract."

comparable language investing the trial court with discretion to deny arbitration when there is a possibility of conflicting rulings.

In summary, we conclude the trial court acted well within the bounds of its discretion in denying arbitration pursuant to section 1281.2, subdivision (c).

The order is affirmed.

Elkington, J., and Holmdahl, J., concurred.