[No. D043188. Fourth Dist., Div. One. Aug. 5, 2004.]

CHRISTOPHER WHALEY et al., Plaintiffs and Respondents, v.
SONY COMPUTER ENTERTAINMENT AMERICA, INC. et al.,
Defendants and Appellants.

480

## COUNSEL

Gibson, Dunn & Crutcher, William D. Claster and Alan J. Gordee for Defendants and Appellants.

Ferruzzo & Worthe, James J. Ferruzzo, John R. Pelle, Todd C. Worthe and Ann L. Mezzacappa for Plaintiffs and Respondents.

## OPINION

**AARON, J.**—Sony Computer Entertainment America, Inc. (SCEA) and Shu Yoshida appeal from an order denying their motion to compel arbitration of a complaint brought against them by Christopher Whaley and Kelly Walker. We conclude that the trial court did not misapply the law in denying the motion pursuant to Code of Civil Procedure[1] section 1281.2, subdivision (c). Accordingly, we affirm the trial court's order.

I

### FACTUAL AND PROCEDURAL BACKGROUND

### A. *SCEA's Complaint Against Ryan and Sevigny*

On April 1, 2003, SCEA filed a complaint against Kelly Ryan and his wife, Traci Sevigny Ryan (Sevigny), in San Diego County Superior Court (the Ryan litigation). In the complaint, SCEA alleged that Ryan, Whaley, and Walker had worked together as employees of SCEA before Whaley and Walker left to form a new company, Red Zone. In October 1998, Red Zone entered into a development agreement with 989 Studio, a division of SCEA, for the development of Sony PlayStation interactive games. Whaley and Walker worked closely with Ryan in developing software for SCEA.

In December 2000, SCEA purchased all the assets of Red Zone and entered into an incentive agreement with certain employees of Red Zone. According to SCEA's complaint, Ryan and Sevigny secretly conspired to make Sevigny a signatory of the incentive agreement so that she would be placed on the payroll of the Red Zone division of SCEA after the acquisition, even though

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

she had held no position at Red Zone and had performed no work for the company. SCEA paid Sevigny approximately $292,000 in salary, pay, and incentive bonus between December 1, 2000 and December 19, 2002, without knowing that Sevigny performed no duties for the company.

SCEA's complaint against Ryan and Sevigny alleged causes of action for conversion, money had and received, fraud by suppression of fact, and fraud by intentional misrepresentation.

### B. Ryan's Cross-complaint Against SCEA

On August 1, 2003, Ryan filed a cross-complaint against SCEA and SCEA vice-president Shu Yoshida. Ryan alleged that before SCEA's acquisition of Red Zone, he had informed Yoshida that he intended to resign from SCEA and join Red Zone so that he could participate in the financial benefits of the acquisition. Ryan told Yoshida that Whaley and Walker were agreeable to such an arrangement. However, Yoshida did not want to lose Ryan as an employee of SCEA. According to the cross-complaint, Yoshida orally agreed that Red Zone could put Sevigny on its payroll so that she would receive the financial benefits Ryan would have received as an employee of Red Zone, and Ryan would remain an employee of SCEA as manager of 989 Studios.

Ryan alleged in his cross-complaint that he was wrongfully terminated by SCEA on February 7, 2003, and that Yoshida falsely disavowed the oral promises he had made about putting Sevigny on SCEA's payroll. Ryan's cross-complaint asserted causes of action for breach of employment contract, breach of third party beneficiary contract, fraud and deceit, intentional interference with prospective economic advantage, implied indemnity, and negligent misrepresentation.

### C. Whaley and Walker's Complaint Against SCEA

On the same day that Ryan filed his cross-complaint, Whaley and Walker filed a separate action against SCEA and Yoshida. Whaley and Walker were represented by the same law firm as Ryan, and their complaint contained substantially the same allegations concerning Yoshida's alleged oral agreement that Sevigny would be added to the Red Zone payroll. Whaley and Walker further alleged that, as part of the acquisition agreement between SCEA and Red Zone, they had entered into written employment agreements and an incentive agreement with SCEA. According to the complaint, SCEA wrongfully terminated Whaley and Walker on February 7, 2003. The complaint asserted causes of action for breach of employment contract, breach of incentive agreement, unpaid wages, fraud and deceit, intentional interference with prospective economic advantage, and negligent misrepresentation.

Though not specifically alleged in the pleadings, the parties do not dispute that Ryan, Whaley and Walker were each terminated for their involvement in the alleged conspiracy to defraud SCEA by arranging to have Sevigny placed on the payroll.

### D. *The Motion to Compel Arbitration*

On September 8, 2003, SCEA and Yoshida filed a motion to compel arbitration of the claims asserted by Whaley and Walker. In the motion, SCEA and Yoshida alleged that Whaley and Walker had refused to submit the matter to arbitration, despite the fact that the asset purchase agreement, the incentive agreement, and the employment agreements all required arbitration of any claims arising out of or relating to the agreements.

Whaley and Walker argued that the court should deny arbitration and consolidate their complaint with Ryan's cross-complaint against SCEA and Yoshida, pursuant to section 1281.2, subdivision (c). Whaley and Walker asserted that their suit against SCEA and Yoshida arose out of the same set of facts as Ryan's cross-complaint and raised the same factual issue: whether Sevigny's employment was the result of a fraudulent conspiracy or an agreement between Yoshida, Ryan, Whaley, and Walker. Because Ryan was not a party to the arbitration agreements and could not be compelled to arbitrate his claims, Whaley and Walker argued that SCEA's motion to compel arbitration should be denied and the matter consolidated with Ryan's cross-complaint.

The trial court denied the motion to compel arbitration under the authority of section 1281.2, subdivision (c). The court reasoned in relevant part:

"The court finds that although an arbitration agreement exists between the parties to this action, that a party to the arbitration agreement (SCEA) is also a party to a pending court action (GIN028761) with third parties (Kelly Ryan and Tracy Ann Sevigny Ryan), arising out of the same transaction or series of related transactions. There is a possibility of conflicting rulings on common issues of law or fa[c]t should the matter proceed to arbitration.

"Specifically, there is the possibility that an arbitrator might find in Case No. GIN031654 that Shu Yoshida, as an authorized agent of SCEA, agreed to allow Traci Ann Sevigny Ryan to participate in the financial benefits of the acquisition of Red Zone by SCEA, and that the termination of Walker and Whaley was therefore an unjustified breach of their employment contract.

"On the other hand, there is a possibility that a judicial officer [in] Case No. GIN028761 might find that Shu Yoshida, acting on behalf of SCEA made

no such agreement with the Ryans, Walker, and Whaley; that the Ryans, Walker, and Whaley acted independently to defraud SCEA; and that SCEA was justified in filing an action against the Ryans. Such a finding would also justify the termination of Walker and Whaley and would be inconsistent with the arbitration award on a material fact."

SCEA and Yoshida[2] appeal from the trial court's order denying their motion to compel arbitration. The order is appealable pursuant to section 1294, subdivision (a).

## II

## DISCUSSION

### A. *Standard of Review*

■ An order staying or denying arbitration under section 1281.2, subdivision (c) is ordinarily reviewed for abuse of discretion. (*Henry v. Alcove Investment, Inc.* (1991) 233 Cal.App.3d 94, 101 [284 Cal.Rptr. 255].) However, the sole issue raised by SCEA on appeal—whether the trial court erred in allowing Whaley and Walker to invoke the protections of section 1281.2—is one of statutory construction. Accordingly, we apply a de novo standard of review. (See *Do v. Superior Court* (2003) 109 Cal.App.4th 1210, 1212–1213 [135 Cal.Rptr.2d 855].)

### B. *The Trial Court Did Not Misapply the Law in Denying the Motion to Compel Arbitration*

SCEA asserts that section 1281.2, subdivision (c) may be applied only at the request of a party to an arbitration agreement who is caught "in the middle" of a multi-party dispute in which some litigants are bound by the arbitration agreement, and others are not. Because Whaley and Walker are not involved in litigation with anyone other than SCEA concerning the matters at issue here—and they are not parties to the Ryan litigation—SCEA argues that Whaley and Walker lack standing to invoke the protections of the statute.[3] We reject this contention.

In construing any statute, "[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we

---

[2] For convenience, we refer to SCEA and Yoshida collectively as "SCEA" throughout the remainder of this opinion.

[3] SCEA does not contend that section 1281.2, subdivision (c) is preempted by the Federal Arbitration Act. (This issue is pending before the Supreme Court in *Cronus Investments, Inc. v. Concierge Services, LLC* (2003), review granted July 16, 2003 (S116288).*)

---

*Reporter's Note: For Supreme Court opinion see 35 Cal.4th 376.

may adopt the construction that best effectuates the purpose of the law." (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [3 Cal.Rptr.3d 623, 74 P.3d 726].) "We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context." (*Ibid.*) If the statutory language is unambiguous, "we presume the Legislature meant what it said, and the plain meaning of the statute governs." (*People v. Robles* (2000) 23 Cal.4th 1106, 1111 [99 Cal.Rptr.2d 120, 5 P.3d 176].)

Section 1281.2 provides in relevant part:

"On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that: [¶] . . . [¶]

"(c) A party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact. . . . [¶] . . . [¶]

"If the court determines that a party to the arbitration is also a party to litigation in a pending court action or special proceeding with a third party as set forth in subdivision (c) herein, the court (1) may refuse to enforce the arbitration agreement and may order intervention or joinder of all parties in a single action or special proceeding; (2) may order intervention or joinder as to all or only certain issues; (3) may order arbitration among the parties who have agreed to arbitration and stay the pending court action or special proceeding pending the outcome of the arbitration proceeding; or (4) may stay arbitration pending the outcome of the court action or special proceeding."

SCEA concedes that it is a party to arbitration agreements with Whaley and Walker; that it is also a party to related litigation with Ryan arising out of the same transaction; and that there is a possibility of conflicting rulings on common issues in the arbitration proceedings and the Ryan litigation, particularly with respect to Yoshida's alleged oral agreement to permit Sevigny to

participate in the financial benefits of the Red Zone acquisition. However, SCEA contends that the trial court erred in applying section 1281.2, subdivision (c) because, according to SCEA, this statutory provision is intended solely for the benefit of a party to the arbitration agreement who is also a party to the related litigation against a third party.

■ We conclude that SCEA's argument is contrary to the plain language of the statute. Section 1281.2, subdivision (c) contains no provision stating that it may be invoked only in favor of the party caught "in the middle" between arbitration and litigation. The statute is unambiguous: it allows the trial court to deny a motion to compel arbitration whenever "a party" to the arbitration agreement is also "a party" to litigation with a third party that (1) arises out of the same transaction or series of related transactions, and (2) presents a possibility of conflicting rulings on a common issue of law or fact. As the trial court concluded, SCEA is "a party" to the arbitration agreements and is also "a party" to litigation with a third party, Ryan, that satisfies the other conditions set forth in the statute. Thus, the trial court had discretion to refuse to compel arbitration in order to avoid the possibility of conflicting rulings. (*Henry v. Alcove Investment, Inc.*, *supra*, 233 Cal.App.3d at p. 101 [the "possibility of conflicting rulings on a common issue of fact is sufficient grounds" to invoke section 1281.2, subdivision (c)]; *C.V. Starr & Co. v. Boston Reinsurance Corp.* (1987) 190 Cal.App.3d 1637, 1642 [236 Cal.Rptr. 167] ["the Legislature has . . . authorized trial courts to refuse enforcement of an arbitration agreement where, as here, there is a possibility of conflicting rulings"].)

The Legislature could easily have chosen to specify that the trial court's authority to deny arbitration pursuant to section 1281.2, subdivision (c) could be exercised only if the party resisting arbitration was also a party to the related litigation with a third party. However, it did not do so. "We may not, under the guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used." (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297].) More specifically, we may not "insert qualifying provisions not included in the statute." (*Estate of Griswold* (2001) 25 Cal.4th 904, 917 [108 Cal.Rptr.2d 165, 24 P.3d 1191].)

SCEA contends that the legislative history of section 1281.2, subdivision (c) supports its interpretation of the statute. We disagree. "Although legislative history often can help interpret an ambiguous statute, it cannot change the plain meaning of clear language." (*In re Steele* (2004) 32 Cal.4th 682, 694 [10 Cal.Rptr.3d 536, 85 P.3d 444].) Because the language of the statute "is unambiguous, we need not consider various extrinsic aids, such as the purpose of the statute, the evils to be remedied, the legislative history,

public policy, or the statutory scheme encompassing the statute." (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 269 [121 Cal.Rptr.2d 203, 47 P.3d 1069].)

SCEA asserts that the legislative history of the statute itself reveals a "latent ambiguity" not apparent from its text. As SCEA notes, "language that appears unambiguous on its face may be shown to have a latent ambiguity; if so, a court may turn to customary rules of statutory construction or legislative history for guidance." (*National Technical Systems v. Commercial Contractors, Inc.* (2001) 89 Cal.App.4th 1000, 1008 [108 Cal.Rptr.2d 67].) " '[A] latent ambiguity is said to exist where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic evidence creates a *necessity* for interpretation or a choice among two or more *possible meanings.*' [Citation.]" (*Mosk v. Superior Court* (1979) 25 Cal.3d 474, 495, fn. 18 [159 Cal.Rptr. 494, 601 P.2d 1030], superseded in *Adams v. Commission on Judicial Performance* (1994) 8 Cal.4th 630, 650–651 [34 Cal.Rptr.2d 641, 882 P.2d 358].)

■ Even if we were to consider the legislative history of the statute, however, we would still find no latent ambiguity suggesting another possible meaning of the statutory language.[4] SCEA relies primarily on a 1977 report written by the State Bar Committee on Arbitration, in which it recommended that the State Bar sponsor the bill which ultimately led to the enactment of section 1281.2, subdivision (c). (Sen. Bill No. 1628 (1977–1978 Reg. Sess).) This report was obtained by Legislative Intent Service, a private company specializing in the research of legislative history and intent, from the file of the legislative representative of the State Bar of California. However, there is no evidence that this State Bar committee report was ever presented to any of the legislators who voted on the bill. Instead, the State Bar legislative representative submitted his own separate analysis of the bill to legislators. In the absence of any evidence that the State Bar committee report was considered by the legislators, it is not a proper indicator of legislative intent. (Cf. *Heavenly Valley v. El Dorado County Board of Equalization* (2000) 84 Cal.App.4th 1323, 1340–1341 [101 Cal.Rptr.2d 591] [refusing to grant judicial notice of letter written by consultant to State Bar

---

[4] We grant SCEA's request for judicial notice as to items 1–11 of the legislative history attached to the declaration of Maria A. Sanders. We deny the request as to item 12 (postenrollment documents regarding Senate Bill No. 1628). Postenrollment documents are not proper indicia of legislative intent because it is not reasonable to infer that they were ever read or considered by the Legislature. (*McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1161, fn. 3 [69 Cal.Rptr.2d 692]; but see *CD Investment Co. v. California Ins. Guarantee Assn.* (2001) 84 Cal.App.4th 1410, 1426 [101 Cal.Rptr.2d 806] [noting that courts have relied upon postenrollment bill reports in interpreting statutes].) We also deny the request as to item 13 (material from the file of the legislative representative of the State Bar of California on Senate Bill No. 1628), for the reasons stated in the text of this opinion.

taxation section which sponsored the bill, in the absence of a showing that the "views expressed therein were presented to the legislators who voted on the bill"].)

█ Nothing in the true legislative history reflects any intent to limit the statute in the manner SCEA suggests. The legislative history broadly defines the problem the Legislature intended to address as follows: "In actions involving multiple parties with related claims, where some claimants agree to arbitrate their differences and others remain outside the agreement, *arbitration is unworkable*. Where a party to an arbitration agreement is also party to a pending court action or special proceeding, with such a third party, *there may be a possibility of conflicting rulings on issues of law or fact*." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1628 (1977–1978 Reg. Sess.) p. 2, italics added.) Thus, the statute was intended primarily to prevent conflicting rulings resulting from arbitration proceedings and other related litigation arising out of the same transaction. Such a risk exists here. Nothing in the legislative history suggests that the court's authority to take measures to prevent such inconsistent rulings is dependent on a request by, or the consent of, the party "in the middle." We conclude that the legislative history does not reveal any "latent ambiguity" in the unambiguous language of the statute.[5]

## III

## CONCLUSION

The trial court did not misapply the law in denying the motion to compel arbitration pursuant to section 1281.2, subdivision (c). SCEA's argument that section 1281.2, subdivision (c) may be invoked only in favor of the party "in the middle" is contrary to the unambiguous language of the statute. Further, the legislative history of the statute reveals no "latent ambiguity" in the statute.

---

[5] Once the trial court correctly determined that section 1281.2, subdivision (c) could be invoked not only by a party caught "in the middle" of a multi-party dispute, but by any party to the arbitration agreement, the court had the following options: (1) refuse to enforce the arbitration agreement and order intervention or joinder of all parties in a single action or special proceeding; (2) order intervention or joinder as to all or only certain issues; or (3) stay arbitration pending the outcome of the court action or special proceeding.

An order staying or denying arbitration under section 1281.2, subdivision (c) is ordinarily reviewed for an abuse of discretion. (*Henry v. Alcove Investment, Inc., supra*, 233 Cal.App.3d at p. 101.) However, as stated above, SCEA's only claim of error in this appeal is one of statutory construction, i.e., whether the trial court misapplied section 1281.2 subdivision (c) by allowing Whaley and Walker to invoke the protections of that provision. Having rejected that claim, there is no basis on which this court could conclude that the trial court abused its discretion in refusing to compel arbitration.

## IV

## DISPOSITION

The trial court's order denying the motion to compel arbitration is affirmed. Costs are awarded to respondents.

McIntyre, J., concurred. Huffman, Acting P. J., concurred in the result.