[No. D056302. Fourth Dist., Div. One. June 1, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
WALTER CORDELL, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part III.A. and C.

COUNSEL

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

AARON, J.—

## I.

## INTRODUCTION

Defendant Walter Cordell appeals from his convictions and sentence after a jury trial. The jury convicted him of attempted premeditated murder, assault with a deadly weapon, criminal threats, rape, rape with a foreign object, and fraudulently conveying an access card. Cordell contends that the trial court erred in failing to instruct the jury that it could consider whether he had an actual and reasonable, but mistaken, belief that the victim consented to the sexual acts. He also contends that there is insufficient evidence that he "conveyed" an access card within the meaning of Penal Code section 484e, subdivision (a).[1] Finally, he contends that the trial court should have stricken the one-year sentence for his prior prison term rather than staying it.

We conclude that the trial court did not err in refusing to instruct on the defense of mistake of fact because Cordell's defense was actual consent, not a mistaken belief that the victim consented to the sexual acts, and because there was no substantial evidence of equivocal behavior on the victim's part

---

[1] Statutory references are to the Penal Code unless otherwise specified.

that would warrant the instruction. However, we agree with Cordell that there is insufficient evidence that he "conveyed" an access card within the meaning of the statute under which he was charged, and that the court should have struck the one-year sentence for his prison term.

II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual background*

#### 1. *The prosecution's evidence*

The victim was the primary witness for the prosecution. She testified that she lived in a house next door to a restaurant that her family owned. She worked at the restaurant with other members of her family. The victim met Cordell in June 2007 at a neighborhood bar, and they began dating. The victim invited Cordell to move in with her because he was staying in a motel at the time and she wanted to help him out. Cordell moved in on April 9, 2008. Shortly thereafter, Cordell told the victim that he had prostate cancer and that he did not want her to see him suffer, so he planned to move out on June 1, 2008. The victim thought that it was a good idea for Cordell to move out because she did not want to see him in pain. Cordell also told the victim that the medication he was taking "was messing up his head and making him do bad things." He told her that he did not want to undergo any more treatments for his cancer, and that without treatment he had only three to six months to live. At that time, Cordell was consuming a lot of alcohol during the day, every day.

On May 30, 2008, two days before Cordell planned to move out, the victim awoke at around noon and had breakfast. Cordell was already drinking. He told the victim that he had an appointment at the "VA Hospital" at around 3:00 p.m., and said that the doctors wanted to talk to her. At around 2:00 p.m., Cordell told the victim that he wanted to have sex with her—what he referred to as "a quicky"—one last time. The victim did not really want to have sex, but agreed "to make him feel better because he's going to the V.A." They proceeded to have consensual vaginal and anal intercourse on the couch.[2]

---

[2] On cross-examination, the victim initially stated that she had some hot tea and then she and Cordell had sex again. She then said that they had sex "just the one time" or "maybe twice after." After reviewing the preliminary hearing transcript, the victim remembered that they had had sex again after she had some hot tea.

Cordell used the victim's piña colada flavored lubricant during these sex acts. Afterward, they got dressed and the victim had something to eat.[3]

Cordell then told the victim that he had a surprise for her. He told her that he wanted to blindfold her. She refused, but agreed to close her eyes. While standing behind the victim, Cordell told her to open a dresser drawer. She opened the drawer and felt around, but the drawer was empty. She opened another drawer, but it, too, was empty. Cordell then told her to turn around and, according to the victim, "that's when the hammer started coming." She saw a glimpse of a hammer in Cordell's raised hand. The hammer was what the victim described as an "engineer's hammer," with two heads that looked the same, instead of a head and claw. Cordell struck the victim in the back of her head and on her arm as she tried to shield herself. When she tried to run, Cordell grabbed her by her hair and threw her down on the hardwood floor. She tried to get up, but Cordell told her that he would kill her if she moved.

While the victim was lying facedown on the floor, Cordell hit her a few more times with the hammer. She was in pain, bleeding from her head and arm, and in shock. Cordell removed all of her clothing and started rubbing her body. He wanted her to say things that she did not want to say and to tell him that what he was doing to her felt good. The victim complied because "I had to. He made me." He then inserted a vibrator into her vagina and her anus. He also rubbed the vibrator against her body.

After Cordell rubbed the victim with the vibrator, he inserted his penis into her vagina. The victim initially testified that she did not know whether he also put his penis in her anus, but then remembered telling a police officer that Cordell had put his penis in her anus. In addition, the victim initially could not remember whether Cordell had also put his fingers in her vagina and anus, but then remembered having told an officer that he had. The victim testified that Cordell had not put his mouth on any part of her body, or that she could not remember whether he had done so. She then corrected herself and said that Cordell had orally copulated her vagina and anus. She also stated that she could not remember whether he had raped her vaginally more than once, and stated "Definitely once. Maybe twice." She reiterated that more than a year had passed since the crimes.

During the assault, the victim's mother, who had walked over to the victim's house from the restaurant, called to the victim through the side

---

[3] On cross-examination, the victim stated that the consensual sex "was before I ate. Oh, before . . . he said there was a surprise in the drawer," and then stated that the consensual sex had occurred "right after I ate." After reviewing the preliminary hearing transcript, she testified that she ate and that they then had sex in the living room. She explained the inconsistencies in her testimony by saying that the events had taken place a long time ago.

window of the house to tell her that she was needed at work. The victim felt that she could not yell or scream at the time, so she called back, "Okay. I'm coming." She was too frightened to call for help because she did not know what Cordell would do if she did.

Cordell used the victim's clothing to wipe blood off of her body. He tried to make her wipe the blood off of her arm, but she could not do it because the pain was too intense. The victim heard Cordell take two photographs of her with a cell phone while she was lying facedown in her own blood. Cordell then put the cell phone, her bloody clothing, and the hammer in a white plastic bag. He told her to give him 15 minutes so that he could get away. He also told her that he had bought a gun, and said that the cops had better bring the SWAT team. He said that he would kill them before he killed himself.

After the victim heard Cordell drive away, she got up slowly, put on clean clothes, and stumbled to the family restaurant next door. Her mother and father saw her stumble to the restaurant, saturated in blood, with her arm "twisted up." The victim told her parents that Cordell had tried to kill her with a hammer, and that he had raped and sexually assaulted her. The victim's sister called 911. In the meantime, a customer at the restaurant who had emergency medical technician (EMT) training began assisting the victim. The victim told the customer that she thought she was going to die. The entire assault lasted from 2:30 p.m. until 6:00 p.m.

At the hospital, the victim was treated for injuries to her head, neck and arm. The victim received approximately 65 stitches and had to undergo two surgeries on her arm. Her neck was fractured. She was placed in a neck brace, and her right arm was placed in a cast. A registered nurse conducted a sexual assault response team (SART) examination in the emergency room. The nurse did not see any bruising during the vaginal and rectal exams, except some bruising on the "perihymenal tissue vestibule." The nurse was not surprised by the lack of trauma to the victim's genital area because Cordell had used lubrication during the assaults. Also, the nurse explained, there tended to be fewer injuries when a sexual assault is committed by a prior sexual partner because the sex partners are familiar with each other's anatomy and how they move. There would also be less injury if the victim had been incapacitated or was not struggling.

The morning after the attack, a neighbor saw Cordell kneeling near an access panel to a crawl space underneath the victim's house. The neighbor called 911 when he saw Cordell crawl under the house. Officers responded, and the SWAT team was summoned. Cordell engaged in a 12-hour standoff with officers, and told them that he would kill their "warriors." Cordell eventually gave up and voluntarily came out of the house to be arrested.

An investigator found Cordell's cell phone in the attic of the victim's house. The phone was broken into two pieces. The investigator also found a backpack stuffed under the floor of the house. Inside the backpack was another cell phone, bolt cutters, a brown jacket, an empty bottle of Jack Daniel's, and a receipt dated May 30, 2008, from a liquor store. An FBI computer forensic examiner recovered photographs from the broken phone, including photos of a naked woman, lying facedown on the floor with her legs spread.

During the investigation, the victim discovered several unauthorized debits on her bank account. Charges had been made to her account at Nick's At The Beach and Chriscola's Liquor Store on May 30, 2008. There was a second charge at the liquor store and a charge at Albertson's on May 31, 2008. The victim did not make these purchases and had not given Cordell permission to use her ATM card. The victim recognized Cordell's signature on receipts dated May 31, 2008, that bore her name, from Albertson's and from Hammer & Nails Hardware, which is located about a block away from the victim's house.

A surveillance tape showed Cordell purchasing two bottles of Coke and a bottle of Jack Daniel's from Chriscola's at 6:06 p.m. on May 30, 2008. A manager of Hammer & Nails Hardware testified that he had known the victim for about 18 years, and said that he had seen Cordell and the victim in the store together on a few occasions. On May 31, 2008, Cordell used a credit card to purchase bolt cutters and a padlock.

As a result of the attack, the victim had to wear a neck brace for three to four weeks. Her right arm was in a cast for a couple of months. She was hospitalized for four days, and recovered at her parents' home for approximately one month. She was unable to return to work for five and a half months. At the time of the trial, she could not make a fist with her right hand, or rotate her right arm. She testified that she would occasionally become lightheaded and dizzy when she would lie down or get up.

### 2. *Prior bad act evidence*[4]

In 1999, Laura K. met Cordell when he came into her hair salon for a haircut. He asked her out, but she declined and told him that she was gay. Cordell and Laura subsequently became friends, and Laura eventually trusted Cordell enough to give him the keys to her shop and her home. He told her that he had pancreatic cancer and that he did not have long to live.

---

[4] The prosecution was permitted to present evidence of this prior bad act under Evidence Code section 1101, subdivision (b).

One night, Laura awoke to find Cordell attempting to insert his penis into her from behind. She "freaked out" and told him that they would no longer be friends if he did that again. Cordell apologized profusely, promised that it would never happen again, and sent her flowers the following day.

Laura began dating a woman named Angela W. Laura, Angela, and Cordell became friends and spent time together. In 2000, Laura and Angela went to Cordell's apartment for a Christmas celebration. Laura and Angela drank champagne while Cordell drank Jack Daniel's and Coke. The three of them exchanged gifts. Cordell said that he was upset because he had been waiting for a call from the Mayo Clinic about his pancreas transplant, but he had not received a call. They discussed that Cordell would be leaving soon to go to the East Coast for treatments. Laura was sad that Cordell might be dying.

Cordell offered to give Laura a backrub and laid a blanket on the floor. While on the blanket, Cordell gave Laura a backrub and then said that he had more presents for Laura and Angela in his backpack, which was in his truck. Cordell sent Angela for the presents. After Angela left the apartment, Cordell dead-bolted the door and turned up the volume of the stereo. Laura, who was lying on the floor on her stomach, felt something very hard hit the back of her head. She looked over her shoulder and saw Cordell holding a wooden club over his head, wielding it like an ax. She scrambled to escape, but Cordell continued to strike her in the head repeatedly while she screamed and attempted to shield the blows with her arms. The two struggled over the club, and Cordell eventually let go, but told her to "Stop screaming or I'm going to kill you."

Laura was able to escape when Cordell went to get a knife. She thought she was going to bleed to death from the injuries to her head. She required 60 stitches on her head, and her finger was broken. Laura testified that Cordell looked "thrilled" while he was attacking her and that "he looked like he was going to enjoy killing me." As a result of the beating by Cordell, Laura's head is dented, and she has scars.

3. *The defense*

Cordell testified on his own behalf. He moved in with the victim in August 2007, but went to prison for a parole violation three weeks later. When he was paroled in April 2008, he moved back in with the victim. At first, they were very happy and had a loving relationship. But then he began drinking heavily. It really bothered the victim when Cordell would drink during the day. He also started to have medical problems. According to Cordell, he was diagnosed with prostate cancer and was receiving injections and radiation treatments. He was also running low on money. The victim asked him to

move out of the house. One day, he went out for a walk, and when he came back to the house, he found all of his possessions near the front door. He tried to talk with the victim about it, and told her that she was his "true love."

On May 30, 2008, Cordell and the victim were hanging around the house before she was scheduled to work between 5:00 and 6:00 p.m. He told the victim that he had an appointment at 3:00 p.m. that day, but this was not true. They had vaginal and anal intercourse at approximately 2:00 p.m. They took a break, and the victim had some tea or water, while Cordell drank alcohol. They had sex a second time at around 4:00 p.m. They started in the kitchen, then went to the sofa, and then had sex on a rug on the hardwood floor. They had vaginal, anal, and oral sex. Cordell used a vibrator during their encounter. He took a cell phone photo of the victim while she was lying naked on the floor with her legs spread. Cordell said that he took this photograph for his personal viewing pleasure, and to use as his cell phone wallpaper.

After they had sex for the second time and he had taken the cell phone photo, Cordell and the victim began arguing about his impending move out of the house. The argument took place about 5:00 or 5:15 p.m. Cordell became angry because he loved the victim and did not want to move out. He also did not think that she was capable of handling his health situation. About 5:30 p.m., he "just lost it" and "snapped." Unable to control his temper, he grabbed a hammer that he had been using for home repairs and hit the victim four times before he realized what he was doing. She tried to run, but he either pushed her to the floor, or she fell. He then struck her one or two more times with the hammer. He was unaware of how seriously he had injured her because her hair was thick, and her arm did not look very swollen.

After Cordell hit the victim with the hammer, he panicked. He knew that he was in "big trouble" because he had been to prison before. He took the hammer, the cell phones, and the victim's credit card, and drove to Chriscola's to buy more alcohol because he was very upset. When he left, the victim was just sitting there, looking at him. He threw the hammer into a dumpster. Cordell made four purchases with the victim's credit card without her permission, as he had done before. He had always paid her back when he had used her credit card in the past. He then went to the beach and just "sat there." Later, he went back to the liquor store and purchased more alcohol. He denied having told the victim that he had a surprise for her, and said that he never told her to close her eyes and open any drawers. According to Cordell, none of the sexual activities were performed against the victim's will, and he did not intend to kill her. Cordell denied that he sexually assaulted the victim at any time after he hit her with the hammer.

Cordell slept in his car that night, and went back to the house the following day to get his things. He did not have his keys to the house, so he stopped at

the hardware store and bought bolt cutters. He used the bolt cutters to access the crawl space under the victim's house, so that he could enter undetected. Once inside, he just sat and drank Jack Daniel's and was "overcome by [the victim's] scent" which he could detect because she had lived in the house for so long. After the police arrived, he tried to talk with them, but they shot him in the hand with a rubber bullet. Cordell said that after police shot him with the rubber bullet, he went to the attic to seek protection, because he was afraid. After a while, he just gave up and turned himself in. He lied to one of the officers when he said that he did not know that the victim was hurt. He also told the officer that he thought the blood on the floor of the house was from the victim's menstrual period. While in jail, Cordell wrote a letter to the victim in which he falsely stated that he had blacked out from 4:00 p.m. to 6:00 p.m. on the day of the hammer attack. He said that he did not remember threatening to kill any of the officers during the standoff.

Cordell admitted that he pled guilty in 2001 to assault with a deadly weapon in relation to the incident involving Laura. He also admitted that he told Laura he had pancreatic cancer, and that this was not true.

### B. *Procedural background*

Cordell was charged with attempted premeditated murder (§§ 187, subd. (a), 189, 664; count 1); assault with a deadly weapon (§ 245, subd. (a)(1); count 2); making a criminal threat (§ 422; count 3); rape (§ 261, subd. (a)(2); counts 4 & 5); forcible sodomy (§ 286, subd. (c)(2); count 6); rape with a foreign object (§ 289, subd. (a)(1); counts 7 through 10); forcible oral copulation (§ 288a, subd. (c)(2); counts 11 & 12); and sale/transfer of an access card (§ 484e, subd. (a); count 13). Great bodily injury enhancements were alleged as to all of the offenses except the criminal threat and access card offenses. (§§ 12022.7, subd. (e), 12022.8.) Each sex offense carried an allegation of use of a deadly weapon. (§ 12022.3, subd. (a).) Great bodily injury and personal use of a deadly weapon allegations were alleged to aggravate the sex offenses within the meaning of the one strike law. (§ 667.61, subds. (b), (c) & (e).) Cordell's 2001 conviction for assault with a deadly weapon (§ 245, subd. (a)(1)) was alleged as a serious felony, a strike, and as a prior prison term (§§ 667.5, subd. (b), 667, subds. (a)(1), (b)–(i), 668, 1170.12).

A jury trial was held between August 27 and September 15, 2009. The jury convicted Cordell of attempted premeditated murder, assault with a deadly weapon, criminal threats, one count of rape, one count of rape with a foreign object, and the access card offense (counts 1 through 4, 7 & 13 respectively). With respect to the attempted murder count, the jury found true the allegation that Cordell personally inflicted great bodily injury. As to the assault with a

deadly weapon count, the jury found that Cordell personally used a deadly weapon and that he inflicted great bodily injury. With respect to the rape and rape with a foreign object counts, the jury found that Cordell personally used a deadly weapon, but did not find that he inflicted great bodily injury. The jury was deadlocked on the remaining counts and allegations. The court declared a mistrial on the deadlocked counts and allegations, and dismissed them at the prosecution's request. Cordell admitted the truth of his prior strike conviction.

On October 15, 2009, the trial court sentenced Cordell to prison for an indeterminate term of life, plus a consecutive indeterminate term of 60 years to life, plus a determinate term of 32 years four months, calculated as follows: life with the possibility of parole for attempted premeditated murder, plus five years for the great bodily injury enhancement, plus five years for the serious felony prior; two consecutive 30-year-to-life sentences (two 15-year terms, doubled for the strike prior) for forcible rape with a foreign object under the one strike law, with each count enhanced by five years for the serious felony prior; six years for the criminal threat (the upper term, doubled); and a consecutive term of one year four months for the access card violation (one-third the middle term, doubled), plus five years for the serious felony prior conviction. The court stayed the sentence on the conviction for assault with a deadly weapon and its related enhancements, under section 654. The court also stayed the one-year sentence for the prior prison term.

Cordell filed a timely notice of appeal.

## III.

## DISCUSSION

A. *The trial court did not err in declining to instruct the jury on the defense of mistake of fact*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *The evidence does not support the grand theft conviction for fraudulently conveying an access card*

Section 484e, subdivision (a) provides that "[e]very person who, with intent to defraud, sells, transfers, or conveys, an access card, without the cardholder's or issuer's consent, is guilty of grand theft." Cordell contends that the evidence was insufficient to support his conviction under this statute

---

\*See footnote, *ante,* page 1564.

because he did not "convey" an access card. Specifically, Cordell maintains that the term "conveys" as used in the statute refers to the transfer of ownership, possession, custody or control of an access card to another, and not to the temporary transfer of possession of an access card to a merchant for the purpose of purchasing goods or services.

1. *Governing law and standard of review*

 a. *Sufficiency of the evidence*

In evaluating a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)

 b. *Statutory construction*

"In construing any statute, '[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' [Citation.] 'We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.]' " (*Whaley v. Sony Computer Entertainment America, Inc.* (2004) 121 Cal.App.4th 479, 484–485 [17 Cal.Rptr.3d 88].) "If the statutory language is unambiguous, 'we presume the Legislature meant what it said, and the plain meaning of the statute governs.' [Citation.]" (*Id.* at p. 485.)

"The provisions of the Penal Code are to be construed 'according to the fair import of their terms, with a view to effect its objects and to promote justice.' [Citation.] Nonetheless, the court cannot create an offense by enlarging a statute, by inserting or deleting words, or by giving the terms used false or unusual meanings. [Citation.] The court must give effect to statutes according to the usual, ordinary import of the language employed in framing them. . . . [Citation.]" (*People v. Stepney* (1981) 120 Cal.App.3d 1016, 1019 [175 Cal.Rptr. 102].) " 'Moreover, "the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." [Citation.] . . . Finally, we keep in mind that " '[t]he defendant is entitled to the benefit of every

reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute.' " [Citations.]' [Citation.]" (*People v. Palmore* (2000) 79 Cal.App.4th 1290, 1295 [94 Cal.Rptr.2d 784].)

██ In discerning the Legislative intent in enacting a statute, courts may rely on the doctrine that a specific statute precludes prosecution under a general statute. (*People v. Butler* (1996) 43 Cal.App.4th 1224, 1242–1243 [51 Cal.Rptr.2d 150].) Under this doctrine, "[t]he fact that the Legislature has enacted a specific statute covering much the same ground as a more general law is a powerful indication that the Legislature intended the specific provision alone to apply. Indeed, in most instances, an overlap of provisions is determinative of the issue of legislative intent and 'requires us to give effect to the special provision alone in the face of the dual applicability of the general provision . . . and the special provision . . . .' " (*People v. Jenkins* (1980) 28 Cal.3d 494, 505–506 [170 Cal.Rptr. 1, 620 P.2d 587]; see *Butler*, at p. 1243.)

### 2. *Additional procedural background*

Cordell was charged in count 13 with "SELLS/TRANSFERS ACCESS CARD." Specifically, count 13 alleges that Cordell "did unlawfully, with intent to defraud, sell, transfer and convey an access card without the cardholder's and issuer's consent," in violation of section 484e, subdivision (a).

As to this count, the trial court instructed the jury solely on the theory that Cordell "conveyed" an access card. The relevant portion of the jury instruction provided:

"The defendant is charged in Count Thirteen with conveying an access card.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant conveyed an access card;

"2. The defendant did so without the consent of the cardholder or the issuer of the card; [¶] AND [¶]

"3. When the defendant conveyed the access card, he intended to defraud." (CALCRIM No. 1950.)

The court provided the following relevant definitions as part of the jury instruction:

"An ATM card, credit card is an access card.

"A *cardholder* is someone who has been issued an access card. [¶] . . . [¶]

"Someone *intends* to *defraud* if he or she intends to deceive another person either to cause a loss of (money[,]/ [or] goods[,]/ [or] services[,]/[or] something [else] of value), or to cause damage to, a legal, financial, or property right. [¶] . . . [¶]

"It is not necessary that anyone actually be defrauded or actually suffer a financial, legal, or property loss as a result of the defendant's acts." (CALCRIM No. 1950, original italics.)

### 3. *Application*

The word "convey" is not explained in the definitional portion of the access card fraud statute (§ 484d), the related statutes involving access card fraud, or in the relevant standard jury instructions, and we are aware of no case that has directly addressed the meaning of this word as used in section 484e, subdivision (a). Relying in part on Black's Law Dictionary, Cordell posits that collectively, the words "sells, transfers or conveys" refer to the transfer of ownership, possession, custody or control of an access card to another, and not to the temporary, momentary or fleeting possession afforded a merchant for the purposes of transacting a purchase of goods or services. Respondent counters by proposing three different dictionary definitions of the word "convey," and contends that each time Cordell presented the victim's credit card without her consent, "he had to give, or convey, the card and its account numbers, to the sales people inside the stores in order to complete his transactions." Finally, respondent states that the plain and common meaning of the word "convey" in the instruction "was understood by all to mean to use or provide." Respondent maintains that the verdict itself establishes that the jurors had no trouble understanding that Cordell necessarily conveyed the victim's access card.

We conclude that the evidence is insufficient to support Cordell's conviction for fraudulently conveying an access card. It is clear from the statutory scheme governing crimes involving access cards that the Legislature differentiated between crimes that involve the fraudulent selling, transferring or conveying of an access card, and those that involve the fraudulent "use" of an access card, when it made these acts punishable under different provisions of the Penal Code.

■ A comparison of the two most relevant statutes—the statute under which Cordell was charged—section 484e, and related section 484g—reveals that the Legislature has distinguished between crimes that involve the fraudulent acquisition, retention or transfer of an access card and crimes that involve the fraudulent *use* of an access card to obtain cash or to make purchases. Section 484e, pertains to crimes in which a person "acquires" (§ 484e, subds. (b)–(d)), "retains" (§ 484e, subds. (c) & (d)), "sells, transfers, or conveys" (§ 484e, subd. (a)) an access card. Section 484g, on the other hand, pertains to crimes in which a person fraudulently "uses" an access card to obtain money, goods, or services.

Support for our reading of the statute can be found by examining section 484g. That section provides in relevant part: "Every person who, with the intent to defraud, (a) *uses*, for the purpose of obtaining money, goods, services, or anything else of value, an access card . . . that has been altered, obtained, or retained in violation of Section 484e or 484f[7] . . . or (b) obtains money, goods, services or anything else of value by representing without the consent of the cardholder that he or she is the holder of an access card and the card has not in fact been issued, is guilty of theft." (§ 484g, italics added.)

It is apparent from the enactment of section 484g that the Legislature has separately proscribed the fraudulent "use"[8] of access cards, and that it distinguished the fraudulent "use" of an access card from fraudulently selling, transferring or conveying one.

Cordell was charged with violating section 484e, subdivision (a). The jury was instructed that in order to convict him of this offense, it had to find that he "conveyed" the victim's access card. However, the evidence presented with respect to count 13 was that Cordell used the card to purchase goods without the victim's permission on four separate occasions. Indeed, the prosecutor's argument to the jury—in which the prosecutor misstated the specific charge, the jury instruction, and section 484e, subdivision (a), was: "The last count is unauthorized *use of an ATM Card*. Here, I have to show that the defendant *used* an ATM card. He did so without the consent of [the victim]." "[Cordell] was out and about partying it up *using* [the victim's] ATM card going to Chriscola's Liquor, hanging out at the beach." (Italics

---

[7] Section 484f provides: "(a) Every person who, with the intent to defraud, designs, makes, alters, or embosses a counterfeit access card or utters or otherwise attempts to use a counterfeit access card is guilty of forgery. [¶] (b) A person other than the cardholder or a person authorized by him or her who, with the intent to defraud, signs the name of another or of a fictitious person to an access card, sales slip, sales draft, or instrument for the payment of money which evidences an access card transaction, is guilty of forgery."

[8] "Use," under section 484g, means " 'put into . . . service.' " (*People v. Love* (2008) 166 Cal.App.4th 1292, 1297–1298 [83 Cal.Rptr.3d 428] [a defendant "use[d]" or " 'put into . . . service' " access card information by entering it into an Internet Web page to place an order].)

added.) The prosecutor neither produced evidence, nor argued to the jury, that Cordell "conveyed" the victim's access card when he handed it to store clerks to make purchases, nor did the prosecutor in any way explain what the word "convey" meant in the context of his closing argument. Further illustrating the error, the trial court stated at the sentencing hearing that it was sentencing Cordell for "*using* [the victim's] credit to go buy alcohol." (Italics added.)

We conclude that the word "conveys" as used in section 484e, subdivision (a) does not pertain to the conduct at issue in this case, i.e., the defendant's use of an access card to purchase goods without the cardholder's permission. To uphold Cordell's conviction on count 13 would require that we insert the words "or uses" into section 484e, subdivision (a), so that it would read "[e]very person who, with the intent to defraud, sells, transfers, . . . conveys, [*or uses*] an access card, without the cardholder's . . . consent, is guilty of grand theft." We are precluded from intruding into the Legislature's domain in such a manner. (See *People v. Massicot* (2002) 97 Cal.App.4th 920, 925 [118 Cal.Rptr.2d 705] [the judiciary's role is to "simply ascertain and declare what is in terms or in substance contained in the statute, not to insert what has been omitted or omit what has been included."].) Further, because the Legislature has clearly proscribed the fraudulent *use* of an access card in a different, specific statutory provision, prosecution of Cordell under section 484e, subdivision (a) was improper. (*People v. Jenkins, supra,* 28 Cal.3d at pp. 505–506.) Based on a plain reading of the relevant statutory provisions, there is no evidence to support Cordell's conviction under section 484e, subdivision (a). We therefore reverse the conviction on count 13 and vacate the corresponding sentence. (See *People v. Leon* (2008) 161 Cal.App.4th 149, 161, 171 [73 Cal.Rptr.3d 786].)[9]

C. *Other corrections to the abstract of judgment.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV.

## DISPOSITION

The conviction on count 13 is reversed and the corresponding sentence is vacated. The one-year prior prison term is stricken. The matter is remanded for resentencing, and the trial court is directed to prepare an amended abstract

---

[9] Because retrial on the count is barred by principles of double jeopardy, we remand for resentencing only. (*People v. Steffens* (1998) 62 Cal.App.4th 1273, 1286–1287 [73 Cal.Rptr.2d 314]; *Burks v. United States* (1978) 437 U.S. 1, 18 [57 L.Ed.2d 1, 98 S.Ct. 2141]; *People v. Hatch* (2000) 22 Cal.4th 260, 271–272 [92 Cal.Rptr.2d 80, 991 P.2d 165].)

[*]See footnote, *ante,* page 1564.

of judgment accordingly. The amended abstract of judgment should correctly identify count 3 as making a criminal threat rather than forcible rape. The trial court is directed to forward a certified copy of the amended abstract of judgment to California's Department of Corrections and Rehabilitation. The judgment is affirmed in all other respects.

Huffman, Acting P. J., and O'Rourke, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 31, 2011, S194619.