[No. B226106. Second Dist., Div. Seven. Feb. 21, 2012.]

BARBARA TRENT LINDEMANN, as Trustee, etc., Plaintiff and Appellant, v.
RICHARD HUME, as Trustee, etc., et al., Defendants and Appellants.

[No. B233273. Second Dist., Div. Seven. Feb. 21, 2012.]

BARBARA TRENT LINDEMANN, as Trustee, etc., Plaintiff and Appellant, v.
RICHARD HUME, as Trustee, etc., et al., Defendants, Cross-defendants and Appellants;
RICHARD CHARLES NAZARIAN et al., Defendants, Cross-complainants and Respondents.

COUNSEL

Law Office of Mark B. Scott and Mark B. Scott for Plaintiff and Appellant.

Lavely & Singer, Brian G. Wolf, Paul N. Sorrell and Matthew E. Panagiotis for Defendants and Appellants and for Defendants, Cross-defendants and Appellants.

Ecoff Blut, Lawrence C. Ecoff and Philip H.R. Nevinny for Defendant, Cross-complainant and Respondent Richard Charles Nazarian.

Jenkins Goodman Neuman & Hamilton, Farley J. Neuman and Dan D. Kim for Defendant, Cross-complainant and Respondent Samuel J. Levin.

OPINION

**PERLUSS, P. J.**—These appeals follow the denial of motions to compel arbitration in a multiparty action arising out of the purchase of a newly built home. The trial court denied the seller parties' motion to compel arbitration of the buyer's causes of action for nondisclosure because there was a possibility of conflicting rulings if these claims were ordered to arbitration and the nonarbitrable causes of action by the buyer against the developer parties proceeded to trial. The court later denied the seller parties' motions to compel their agents to arbitrate the agents' cross-claims for indemnification on the ground the agents were not bound to submit those claims to arbitration by the arbitration clause in the purchase agreement. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### 1. *The Parties and Principal Actors*

Richard Hume is a trustee of the Hancock Park Real Estate Trust (Hancock Park Trust); Nicolas Cage is the trust's beneficiary.[2] In November 2001 Cage

---

[1] The factual background is taken primarily from the third amended complaint and attached exhibits. The parties do not dispute the truth of the allegations for the purpose of resolving whether the trial court properly denied the motions to compel arbitration.

[2] We refer to Cage and Hume collectively as the Hancock Park defendants.

agreed to purchase a home being built by developer The Lee Group on Ocean Front Walk in Venice. Cage's advisors at the time included former business manager Samuel J. Levin, who became a cotrustee of the Hancock Park Trust in July 2002;[3] Richard Charles Nazarian, a general contractor who assisted with Cage's real estate investments; and real estate agent James Chalke. Before escrow closed in February 2002, Cage transferred the purchase agreement to Hume so title would be taken in the name of the Hancock Park Trust.

Barbara Trent Lindemann is the trustee of the Bradford Lindsley Schlei Trust II (Schlei Trust); Bradley Lindsley Schlei is that trust's principal beneficiary. The Schlei Trust purchased the home from the Hancock Park Trust in May 2003.

 2. *The Sale of the Home by the Hancock Park Trust to the Schlei Trust*

 a. *Cage moves into the home but decides to sell it six months later*

In February 2002 Nazarian, Chalke and a company retained by Levin to analyze the home's plans conducted a preclosing walk-through of the property. The following day Chalke engaged an inspection service to perform a prepurchase physical inspection. Before escrow closed on February 22, 2002, The Lee Group agreed to provide, in addition to a limited construction warranty,[4] a warranty for 10 years "to remedy and repair any and all damage resulting from water infiltration, intrusion or flooding due to the fact that the doors on the second and third floors of the residence at the Property were not originally installed at least one-half inch (1/2") to one inch (1") above the adjacent outdoor patio tile/floor on each of the second and third floors . . . ."

Soon after Cage moved into the Ocean Front Walk home, he encountered water intrusion, flooding and other problems. Cage informed The Lee Group, but they were unable to fix the problems. In mid-August 2002 Hume, at Cage's direction, signed a listing agreement with Chalke to sell the home.

---

[3] The trust agreement includes a clause indemnifying the trustee for any "loss, damage, costs, charges, judgments, attorney's fees or other sums which the Trustee may have paid out, suffered or incurred . . . ." It does not include a clause requiring the trustee and the beneficiary to arbitrate any disputes between them.

[4] The limited construction warranty generally provides one- to two-year coverage for the home's structural components, including the roof, walls, floors, foundation and ceilings.

b. *The cancelled escrow for the sale of the home to the Kamienowiczs; the Anderson report*

In mid-December 2002 Chalke received an offer from Hedy and Samy Kamienowicz to purchase the home. Levin accepted the offer on behalf of the Hancock Park Trust. Also during December 2002 Nazarian received a photograph from a nearby property owner depicting exterior site flooding at the home. Chalke then provided the Kamienowiczs' real estate agent with a disclosure statement noting, "There is a problem with the drainage system that is currently being addressed by the Lee Group (developer)"; a box was also checked indicating the seller was aware of "[f]looding, drainage or grading problems."

During escrow the Kamienowiczs' agent received a property inspection report noting sandbags had been placed along portions of the property and the finished floor of the house was below some areas of the exterior grade and only a little higher in other areas. The report recommended "[a] qualified drainage person should be contacted for further evaluation of the exterior drainage." The report was provided to Nazarian, who engaged civil engineer Robert Anderson to assess the issue. After the Kamienowiczs' agent spoke to Anderson, who explained there was no "quick fix" because any viable solution would require a storm drain line or storm retention system on city property, the Kamienowiczs disapproved the condition of the property and terminated escrow.

On February 14, 2003 Nazarian received a report from Anderson's firm identifying several "remedial measures" to improve site drainage conditions, including installation of a larger sump pump, but noting they were "not a 'fix' and [would] not mitigate the site drainage problem." The report further stated, "[A]ny owner will need to accept the risk associated with the drainage at the site. The site will need to experience large rainfalls to determine if the remedial measures work. . . . However, it appears that should these options be implemented, that the site should perform reasonabl[y] except under the more extreme conditions. Under that scenario, we would expect that the entire region would be subjected to widespread flooding."

In response to Anderson's report, Nazarian sent Anderson a letter stating he had been at the home over the preceding several days during which a considerable amount of rain had fallen and there had been no "standing water accumulation or any related water problems." Nazarian commented on the need for, and feasibility of, the remedial measures proposed by Anderson, concluding, "In my opinion, I would not include or refer to [items Nos. 3, 5, and 6] as part of a 'minimal acceptable level of repair' but rather have them

considered as options for additional protections as these areas presented no problems in our recent and considerable rainfall." Anderson refused to modify his report.

 c. *The sale of the home to the Schlei Trust; the engineers'*
 *investigations*

In May 2003 Lindemann made an offer to purchase the home, which Levin accepted. The purchase agreement signed by Levin as trustee of the Hancock Park Trust included an arbitration clause, paragraph 17(B)(1), which provides in part, "Buyer and Seller agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration . . . ."[5] Levin, as well as a representative of the Schlei Trust, initialed the arbitration provision.

During escrow Chalke provided Lindemann with a disclosure statement, signed by Hume, describing as the only significant defect, "Wood floor in basement needs to be replaced in places." With respect to flooding, drainage or grading problems, the disclosure statement noted, "There was a drainage problem at the front of the house at the boardwalk area. The problem was diagnosed by a hydrologist and subsequently remedied. No new problem has been discovered." The report prepared by Anderson was not provided to Lindemann, nor was the existence and termination of the Kamienowicz escrow disclosed.

Escrow closed on May 23, 2003, The Lee Group's construction warranties were transferred to the Schlei Trust and Schlei moved in. About a week later the neighbor in the adjacent home, also built by The Lee Group, told Schlei a larger sump pump might be required to drain surface water at the homes.

Lindemann's real estate agent asked Chalke whether the drainage work mentioned in the disclosure statement would prevent future flooding. In response, Nazarian sent Schlei a letter stating, "[W]hile we did have drainage problems, which flooded the side and front yard, I looked at that problem with The Lee Group, a consulting architect and finally a civil engineer/hydrologist. After careful study a plan recommended by the hydrologist was [e]ffected by The Lee Group to prevent that situation from recurring."

---

 [5] The arbitration clause separately provides, in paragraph 17(B)(3), "BROKERS: Buyer and Seller agree to mediate and arbitrate disputes or claims involving either or both Brokers . . . provided either or both Brokers shall have agreed to such mediation or arbitration prior to, or within a reasonable time after, the dispute or claim is presented to Brokers."

In February 2004 Schlei notified Nazarian and The Lee Group that the home was experiencing flooding, water intrusion at various windows and doors, rusting and moisture intrusion, especially at the first level wood flooring. From February 2004 until early May 2008 Nazarian and The Lee Group conducted investigations and performed work to solve the problems, but were unsuccessful. In late 2008 and early 2009 Lindemann engaged geotechnical and structural engineers to assess the home. As a result of their investigations, the engineers discovered foundation, drainage, structural and superstructure defects and/or damage.

### d. *The complaints*

In May 2009 Lindemann filed a complaint against The Lee Group and related parties (collectively, The Lee Group) asserting causes of action including fraudulent concealment, negligent nondisclosure and breach of express warranty. In June 2009 Lindemann filed a first amended complaint adding additional causes of action and naming as Doe defendants the Hancock Park defendants. In August 2009 Lindemann filed a second amended complaint. During October and November 2009 the Hancock Park defendants and The Lee Group filed cross-complaints against each other for indemnity.

On December 10, 2009, following successful demurrers to the second amended complaint by both the Hancock Park defendants and The Lee Group, Lindemann filed a third amended complaint, the operative pleading. It asserts causes of action against The Lee Group for (1) strict liability (construction defect); (2) fraudulent concealment, suppression of fact, nondisclosure; (3) negligent nondisclosure; (4) negligence per se; (5) negligence; and (6) breach of express warranties. It also asserts causes of action against the Hancock Park defendants for (1) fraudulent concealment, suppression, nondisclosure and (2) negligent nondisclosure predicated on the failure to disclose information pertaining to the drainage problem, including the property inspection report prepared in connection with the Kamienowicz escrow, the subsequent report prepared by Anderson and the existence and termination of the Kamienowicz escrow.

### 3. *The Denial of the Hancock Park Defendants' Motion to Compel Lindemann to Arbitrate*

In January 2010 the Hancock Park defendants moved to compel Lindemann to arbitrate her nondisclosure causes of action against them pursuant to the arbitration clause in the purchase agreement. They argued Lindemann's claims were only tangentially related to her construction defect causes of action against The Lee Group and thus there was little risk separate proceedings would result in conflicting rulings: "[Lindemann's] claims against the

Hancock Park [d]efendants turn on whether the Hancock Park [d]efendants failed to make required disclosures regarding alleged drainage problems while [Lindemann's] claims against [T]he Lee Group [d]efendants involve numerous alleged construction defects at the Property, primarily related to the construction of the foundation." The Hancock Park defendants explained they had not moved to compel arbitration sooner because they had only recently obtained a legible copy of the purchase agreement showing the arbitration clause had been initialed by the parties.

On June 9, 2010 the trial court denied the motion on the ground there was a possibility of conflicting rulings on common issues of law and fact if the nondisclosure causes of action against the Hancock Park defendants were ordered to arbitration and the litigation against The Lee Group proceeded in superior court. (Code Civ. Proc., § 1281.2, subd. (c).)[6] The court ruled, "With respect to both the developer defendants and the seller defendants, the threshold issue is whether there was a problem with the construction of the property in the first instance. If there was no problem with the construction of the property, then there was nothing to fail to disclose. Thus, there is the possibility of conflicting rulings if the case against the sellers is heard in arbitration and the case against the developers is heard in court. For example, the jury could find there was no construction defect at the property, while the arbitration finds that there was a construction defect, the sellers knew about it, and the sellers failed to disclose it. Alternatively, the arbitrator could find that there was no defect, and therefore not reach the questions about knowledge and/or failure to disclose, while the jury finds there was a construction defect."

The Hancock Park defendants appeal from that order. Lindemann has cross-appealed, asserting the order denying arbitration may be affirmed on the alternative ground the Hancock Park defendants waived their right to compel arbitration by participating in the litigation for several months before filing their motion.[7]

### 4. *The Denial of the Hancock Park Defendants' Motions to Compel Levin and Nazarian to Arbitrate*

In late June 2010, after the trial court had denied the Hancock Park defendants' motion to compel arbitration, Lindemann amended her third amended complaint by substituting Nazarian and Nazarian doing business as The Nickel Company (collectively Nazarian), Samuel Levin and related

---

[6] Statutory references are to the Code of Civil Procedure.

[7] No cross-appeal is needed for Lindemann to make this argument. (See § 906.) In light of our decision affirming the trial court's order denying the motion to compel arbitration of Lindemann's claims, we need not address the issue of waiver.

entities (collectively Levin) and Chalke for fictitiously named defendants.[8] Subsequently, Levin and Nazarian filed cross-complaints against each other and the Hancock Park defendants, asserting causes of action including equitable indemnity, express indemnity and apportionment of fault.

On January 7, 2011, before Levin had filed his cross-complaint for indemnification against the Hancock Park defendants, the Hancock Park defendants moved to compel arbitration of Nazarian's indemnification claims. They argued Nazarian is bound by the arbitration clause in the purchase agreement even though he did not sign it because he was acting as the Hancock Park defendants' agent when he allegedly failed to make disclosures required pursuant to the purchase agreement. On March 3, 2011, after Levin had filed his cross-complaint, the Hancock Park defendants moved to compel arbitration of those claims, contending Levin was bound by the arbitration clause in the purchase agreement because he had signed it and was acting as their agent.

On April 11, 2011 the trial court denied both motions, finding, "[T]he language of the arbitration provision makes clear that it does not apply to the claims for indemnification. The actual provision provides for arbitration between 'Buyer and Seller' and claims 'arising between them.' The claims at issue of this motion are not between buyer and seller. They are between the various sellers."

The Hancock Park defendants have appealed this order, as well. The trial court stayed all proceedings except certain construction defect site inspections during the pendency of the appeals.

## DISCUSSION

### *The Order Denying the Motion to Compel Lindemann to Arbitrate*

1. *Governing Law*

Section 1281.2 generally requires the trial court to order arbitration of a controversy "[o]n petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy . . . if it determines that an agreement to arbitrate the controversy exists." Arbitration of a controversy

---

[8] In January 2011 the third amended complaint was again amended, this time to assert against Levin and Nazarian only the causes of action asserted against the Hancock Park defendants.

need not be ordered, however, if the court determines that "[a] party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact. . . ." (§ 1281.2, subd. (c); see *Pilimai v. Farmers Ins. Exchange Co.* (2006) 39 Cal.4th 133, 141 [45 Cal.Rptr.3d 760, 137 P.3d 939] [under § 1281.2, subd. (c), a party's contractual right to arbitration " 'may have to yield if there is an issue of law or fact common to the arbitration and a pending action or proceeding with a third party and there is a possibility of conflicting rulings thereon' "]; *Mercury Ins. Group v. Superior Court* (1998) 19 Cal.4th 332, 347 [79 Cal.Rptr.2d 308, 965 P.2d 1178] [same]; *Whaley v. Sony Computer Entertainment America, Inc.* (2004) 121 Cal.App.4th 479, 486 [17 Cal.Rptr.3d 88] [§ 1281.2, subd. (c), "is unambiguous: it allows the trial court to deny a [petition] to compel arbitration whenever 'a party' to the arbitration agreement is also 'a party' to litigation with a third party that (1) arises out of the same transaction or series of related transactions, and (2) presents a possibility of conflicting rulings on a common issue of law or fact"].)

### 2. *Standard of Review*

An order denying a petition to compel arbitration under section 1281.2, subdivision (c), is generally reviewed for abuse of discretion. (*Birl v. Heritage Care, LLC* (2009) 172 Cal.App.4th 1313, 1318, 1320 [91 Cal.Rptr.3d 777] [trial court's determination that action filed against one set of defendants arose out of same transaction as that involving defendant who had moved to compel arbitration reviewed for abuse of discretion]; *Metis Development LLC v. Bohacek* (2011) 200 Cal.App.4th 679, 691 [133 Cal.Rptr.3d 585] [appellate court reviews trial court's determination whether there is a possibility of conflicting rulings on a common issue of law or fact for abuse of discretion]; *Whaley v. Sony Computer Entertainment America, Inc., supra,* 121 Cal.App.4th at p. 484 ["[a]n order staying or denying arbitration under section 1281.2, subdivision (c) is ordinarily reviewed for abuse of discretion"].) However, the correct interpretation of section 1281.2, subdivision (c), like any other issue of statutory interpretation, is a question of law subject to de novo review. (*Birl,* at p. 1318; *Whaley,* at p. 484.)

### 3. *The Trial Court Did Not Err in Denying the Hancock Park Defendants' Motion to Compel Lindemann to Arbitrate*

The Hancock Park defendants contend section 1281.2, subdivision (c), is inapplicable to their motion to compel arbitration of Lindemann's nondisclosure claims against them because those causes of action and the construction defect causes of action against The Lee Group do not arise out of the same

transaction or series of transactions and also because there is no possibility of conflicting rulings. Both contentions are incorrect.

■ As the Hancock Park defendants emphasize, Lindemann's claims against The Lee Group stem from the allegedly negligent design and construction of the home, which occurred before the Hancock Park Trust purchased the property, while the nondisclosure causes of action against them arise out of their alleged failure to make required material disclosures in connection with the resale of the home three years later. Thus, they are correct the claims do not arise from the same transaction. Their further contention that the causes of action do not arise out of a series of related transactions, however, requires an unduly cramped view of section 1281.2, subdivision (c), that we reject.

The gravamen of Lindemann's action is that she bought a newly constructed home with multiple construction defects and the Hancock Park defendants, although not the home's developer, knew of at least one alleged defect—inadequate site drainage leading to flooding—but failed to disclose it as they had to the Kamienowiczs during escrow with them several months earlier. The Hancock Park Trust was not simply an intervening, unsophisticated buyer who had purchased the home from The Lee Group with no involvement in the construction process or knowledge of the alleged drainage defect. The Hancock Park Trust bought the home while it was still under construction. Before escrow closed, the Hancock Park defendants' agents (including a general contractor, Nazarian), or companies engaged by them, analyzed the home's plans, had a prepurchase physical inspection completed and were able to obtain from The Lee Group an additional 10-year warranty to remedy and repair damage resulting from water infiltration and flooding resulting from the improper installation of certain doors.

■ According to Lindemann's complaint, the Hancock Park defendants' role in discovering potential construction defects continued through the cancelled escrow with the Kamienowiczs. During that time Nazarian challenged Anderson's conclusion as to what items should be included as remedial measures to address the site drainage problem. While any actual construction defects originated with the design of the home several years earlier, the transactions by which (a) the Hancock Park defendants first acquired the home from its developer, The Lee Group, following extensive discussions of possible water intrusion problems; (b) then unsuccessfully attempted to sell the property to the Kamienowiczs, an effort that foundered following disclosure of the drainage issues; and (c) finally resold the home to the Schlei Trust without making the same disclosures as had been made to the Kamienowiczs, were without question "related." (See *Birl v. Heritage Care, LLC, supra,* 172 Cal.App.4th at p. 1320 ["a temporal separation does not

necessarily negate the existence of the requisite 'series of related transactions' "].) That Lindemann's claims against The Lee Group may be more extensive[9] or predicated upon different theories of liability does not change the conclusion she is both a party to the arbitration agreement and a party to a pending court action arising out of a series of related transactions, whether we review that determination by the trial court de novo or under the deferential abuse of discretion standard.

The Hancock Park defendants' additional contention there is no risk of inconsistent rulings if the causes of action against them proceed to arbitration and the causes of action against The Lee Group are tried in superior court is similarly without merit. Contrary to the trial court's finding, they contend the existence of a construction defect is not a threshold question in the action against them because an arbitrator could determine the drainage system at the home was neither defectively designed nor constructed, but the Hancock Park defendants nevertheless breached a duty to disclose the risk of flooding with severe rainstorms because of essentially inherent site conditions. In support, they note the Anderson report indicates the drainage problem at the home is part of a larger issue in the general area and not associated with a specific defect at the home. The Hancock Park defendants also contend the arbitrator could alternatively find the drainage system was defectively designed and/or constructed, but they had adequately disclosed the problems.

■ To be sure, whether or not the drainage system was defectively designed or constructed may not ultimately resolve whether the Hancock Park defendants failed to disclose a material condition of the property. The issue to be addressed under section 1281.2, subdivision (c), however, is not whether inconsistent rulings are inevitable but whether they are possible if arbitration is ordered. Here, that the arbitrator could find a design or construction defect existed as a predicate to holding the Hancock Park defendants liable for failing to disclose a material condition of the property and the finder of fact in the superior court action could reach a contrary conclusion is sufficient to satisfy that requirement. Indeed, the Hancock Park defendants and The Lee Group have filed cross-complaints for indemnification against each other, further increasing the risk of inconsistent rulings.

Finally, the Hancock Park defendants contend, even if section 1281.2, subdivision (c), is applicable, the trial court should have ordered arbitration and then stayed it pending a judicial determination whether the drainage

---

[9] Lindemann alleges the home has a host of construction defects in addition to the site drainage problem that is the focus of her nondisclosure claim against the Hancock Park defendants. For example, she alleges the foundation was not constructed in accordance with the approved plans, the Los Angeles Building Code and convention for posttensioned concrete construction and likely will not provide adequate support for the home.

system was negligently designed or constructed, thus enforcing their right to arbitration while promoting judicial economy and efficiency. The trial court considered this option and carefully questioned counsel about it. However, after the court determined the Hancock Park defendants and The Lee Group were willing, in effect, to suspend their cross-complaints and resolve them in a separate forum after the conclusion of the primary action, counsel for Lindemann argued there would still be a possibility of conflicting rulings because "we know already that there were some repairs that were made by the seller which were effected by the Lee Group before the house was sold, and I think they're not just going to say what did they know, there's going to be issues as to whether the work that was done by the Lee Group made the problem better, whether it could have worsened it, whether there are agency issues. Those are issues that would be involved in both cases. . . ." After considering argument, the court found, "[T]he issues are too inextricably mixed between the arbitration and the civil action, that there is no reason to conduct the arbitration as well as the civil action."

Although the Hancock Park defendants attempt to portray the issues in this case as discrete and segregable, we cannot say the trial court's contrary conclusion exceeded the bounds of reason. (See *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478 [243 Cal.Rptr. 902, 749 P.2d 339] ["appropriate test for abuse of discretion is whether trial court exceeded the bounds of reason"].) While the Hancock Park defendants contend the trial court itself had determined a finding there was no construction defect would obviate the need for arbitration, they also argue a trier of fact could find them liable absent a construction defect—that is, arbitration would still be necessary—in an attempt to dispute the possibility different actions could result in conflicting rulings. Their contradictory arguments simply reinforce our conclusion it was eminently reasonable for the court to conclude the entire case should be resolved in a single litigation.

### *The Order Denying the Motion to Compel Levin and Nazarian to Arbitrate*

■ California law recognizes " 'a strong public policy in favor of arbitration[].' " (*Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 706 [131 Cal.Rptr. 882, 552 P.2d 1178]; see *Wagner Construction Co. v. Pacific Mechanical Corp.* (2007) 41 Cal.4th 19, 25–26 [58 Cal.Rptr.3d 434, 157 P.3d 1029].) The Supreme Court has repeatedly stated that arbitration of disputes is favored; and, when there is doubt as to the meaning and construction of an arbitration agreement, that doubt should be resolved in favor of ordering arbitration. (See, e.g., *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899]; *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971–972 [64 Cal.Rptr.2d 843, 938 P.2d 903].)

Nonetheless, the court has also instructed, "[a]lthough '[t]he law favors contracts for arbitration of disputes between parties' [citation], ' "there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate." ' " (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744 [222 Cal.Rptr. 1, 710 P.2d 833]; accord, *Bono v. David* (2007) 147 Cal.App.4th 1055, 1063 [54 Cal.Rptr.3d 837] [" '[t]here is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate' "]; *Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653 [35 Cal.Rptr.2d 800].)

"Mutual assent is required for there to be an enforceable agreement to arbitrate disputes. ' "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." ' " (*Burch v. Premier Homes, LLC* (2011) 199 Cal.App.4th 730, 745–746 [131 Cal.Rptr.3d 855]; accord, *County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 244 [54 Cal.Rptr.2d 628]; see generally *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 945 [131 L.Ed.2d 985, 115 S.Ct. 1920] ["a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration . . ."].) "[T]he scope of arbitration 'is, of course, a matter of agreement between the parties.' " (*Crowley Maritime Corp. v. Boston Old Colony Ins. Co.* (2008) 158 Cal.App.4th 1061, 1069 [70 Cal.Rptr.3d 605]; see *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 705 [111 Cal.Rptr.3d 876].)

As discussed, the arbitration clause in the purchase agreement between the Hancock Park Trust and the Schlei Trust broadly applies to all disputes or claims between the two trusts as seller and buyer arising out of the transaction. An additional provision permits the scope of the arbitration provision to be expanded to include disputes between either of the two trusts and the real estate brokers who assisted in the transaction. The Hancock Park defendants, on the one hand, and Lindemann, Levin and Nazarian, on the other hand, vigorously contest whether nonsignatories Levin[10] and Nazarian are bound by this arbitration provision. (Compare, e.g., *Westra v. Marcus & Millichap Real*

---

[10] Levin signed the purchase agreement and initialed the arbitration clause as trustee of the Hancock Park Trust. He asserts, and the Hancock Park defendants dispute, that act does not bind him in his individual capacity. (See *Benasra v. Marciano* (2001) 92 Cal.App.4th 987, 991 [112 Cal.Rptr.2d 358] [arbitration provisions in licensing agreements between two corporations do not obligate corporate officer who signed agreements only in that capacity to arbitrate defamation claim filed in his individual capacity although claim arose from, and related to, corporate dispute subject to arbitration; "[t]he fact that a nonsignatory to a contract may in some circumstances be viewed as a third party beneficiary or an agent who is entitled to *compel* arbitration [citation] is legally irrelevant where, as here, [the nonsignatory] *is not the one who wants to be bound by the arbitration provision in a contract that he signed only in a representative capacity*"].)

*Estate Investment Brokerage Co., Inc.* (2005) 129 Cal.App.4th 759, 763 [28 Cal.Rptr.3d 752] ["[g]enerally speaking, one must be a party to an arbitration agreement to be bound by it or invoke it"]; *Matthau v. Superior Court* (2007) 151 Cal.App.4th 593, 598 [60 Cal.Rptr.3d 93] ["right to arbitration depends on a contract, and a party can be compelled to submit a dispute to arbitration only if the party has agreed in writing to do so"] with, e.g., *Dryer v. Los Angeles Rams* (1985) 40 Cal.3d 406, 418 [220 Cal.Rptr. 807, 709 P.2d 826] [individual defendants in action for breach of contract are entitled to benefit of arbitration even though not parties to the contract between plaintiff and defendant corporation]; *County of Contra Costa v. Kaiser Foundation Health Plan, Inc., supra,* 47 Cal.App.4th at p. 242 [describing third party beneficiary and agency exceptions to general rule that parties who did not sign arbitration agreement may not be compelled to arbitrate a dispute]; *Suh v. Superior Court* (2010) 181 Cal.App.4th 1504, 1513 [105 Cal.Rptr.3d 585] [describing "six theories by which a nonsignatory may be bound to arbitrate: '(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary . . .' "]; see also *JSM Tuscany, LLC v. Superior Court* (2011) 193 Cal.App.4th 1222, 1238–1240 [123 Cal.Rptr.3d 429] [just as nonsignatory defendant may compel signatory plaintiff to arbitrate under the doctrine of equitable estoppel, nonsignatory plaintiff may be equitably estopped from repudiating arbitration clause in contract when asserting claims that rely on contract terms, particularly when signatory and nonsignatory plaintiffs are related entities].)

We need not resolve that dispute. Even if Levin and Nazarian are bound by the arbitration agreement and could be compelled to arbitrate certain disputes arising from the sale of the Ocean Front Walk property (for example, Lindemann's claims against them for nondisclosure), their claims for indemnity from the Hancock Park defendants are outside the scope of the arbitration provision, which covers only disputes between the seller and the buyer, not internecine disputes among members of the seller's team of advisors.[11] Indeed, if the Schlei Trust and the Hancock Park Trust had not intended the mandatory arbitration provision in paragraph 17(B)(1) of the purchase agreement to be limited to disputes between themselves, there would have been no reason to separately agree in paragraph 17(B)(3) to expand the scope of the arbitration agreement to include "disputes or claims involving either or both Brokers" subject to the real estate brokers' agreement to arbitration. (Cf. *Nguyen v. Tran* (2007) 157 Cal.App.4th 1032, 1038 [68 Cal.Rptr.3d 906] [although buyer's real estate brokers were not parties to purchase agreement containing an arbitration clause, buyer's and seller's express agreement to

---

[11] We review the scope of an arbitration provision de novo when, as here, that interpretation does not depend on conflicting extrinsic evidence. (*RN Solution, Inc. v. Catholic Healthcare West* (2008) 165 Cal.App.4th 1511, 1522 [81 Cal.Rptr.3d 892]; *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 684 [99 Cal.Rptr.2d 809].)

arbitrate disputes involving the brokers, not merely agency relationship between buyer and brokers, permitted brokers to compel buyer to arbitrate its claims against them].)

*Westra v. Marcus & Millichap Real Estate Investment Brokerage Co., Inc.,* *supra*, 129 Cal.App.4th 759, cited by the Hancock Park defendants, does not require a different result. In that case the purchaser of real estate sued the seller and a real estate broker/agent, Marcus & Millichap, who had acted for both principals, for fraud in connection with the sale. The purchase agreement contained an arbitration clause that expressly provided the buyer, seller and broker/agent all agreed any controversies arising from the agreement or the contemplated real estate transaction would be resolved by arbitration. Although the arbitration provision was followed by lines for the seller and buyer to initial to indicate their consent, there was no similar line for the broker/agent, who also did not sign the purchase agreement itself. When the seller and the broker/agent petitioned to compel arbitration of the fraud claims against them, the trial court granted the petition as to the seller but denied the petition as to the broker/agent. (*Id.* at p. 762.) The Court of Appeal reversed, holding the broker/agent, even though not a party to the purchase agreement, was entitled to arbitrate the claims against it: "The language of the purchase agreement, as well as the arbitration provision itself, clearly states that the Westras [(buyers)], MM [(Marcus & Millichap, the broker/agent)], and Skyline [(seller)] agreed to arbitrate disputes involving the subject matter of the purchase agreement . . . . This language was thus binding on MM as well as the Westras, and MM as an agent is entitled to enforce the arbitration agreement, to which the Westras and Skyline had agreed." (*Id.* at p. 766.)

Although like nonsignatory broker/agent Marcus & Millichap in the *Westra* case Levin and Nazarian had a preexisting relationship with the Hancock Park defendants, nothing in the purchase agreement for the Ocean Front Walk property contemplates that disputes between one of the principals to the transaction and its own business advisors are subject to arbitration, whether or not those claims somehow relate to, or arise out of, the Schlei Trust's acquisition of the home. The Hancock Park defendants could have included such a right in the purchase agreement (as they did for their real estate agent) or bargained for it when engaging Levin and Nazarian as business advisors, but apparently either chose not to or were unable to obtain their agreement. (Cf. *JSM Tuscany, LLC v. Superior Court, supra*, 193 Cal.App.4th at p. 1240, fn. 20 [result in *County of Contra Costa v. Kaiser Foundation Health Plan, Inc., supra*, 47 Cal.App.4th 237 "could have been reached on the theory that the codefendants' cross-actions [for indemnity] against the health insurer were not based on the *contract* between the insurer and the plaintiff"].)

As a practical matter, our conclusion Levin and Nazarian's indemnity claims are outside the scope of the arbitration provision in the purchase agreement has little significance. Even were we to conclude those claims are subject to arbitration, on remand the trial court would need to determine whether that right should yield under section 1281.2, subdivision (c), because of the possibility of conflicting rulings on issues of law or fact that will be tried in Lindemann's superior court action against Levin and Nazarian, as well as the Hancock Park defendants.[12] In light of the trial court's ruling on that point in denying the Hancock Park defendants' motion to compel Lindemann to arbitrate her claims against them, it is highly unlikely a different result would obtain with respect to Levin's and Nazarian's cross-claims.

## DISPOSITION

The orders are affirmed. Lindemann is to recover her costs on appeal.

Woods, J., and Zelon, J., concurred.

---

[12] Although section 1281.2, subdivision (c), was raised as a ground for denying the motion to compel Levin and Nazarian to arbitrate, the trial court did not rule on that issue. Lindemann's contrary assertion is not supported by any citation to the record, and our own review of the record on appeal indicates the court discussed section 1281.2, subdivision (c), but did not base its decision on that provision.