Filed 11/26/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BUNKER HILL PARK LIMITED, | B256822 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. SS024317) |
| v. | |
| U.S. BANK NATIONAL ASSOCIATION, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Richard A. Stone, Judge. Reversed with directions.

Pircher, Nichols & Meeks, James L. Goldman; Shartsis Friese, Joel Zeldin and Charles R. Rice, for Plaintiff and Appellant.

Katten Muchin Rosenman, Joshua Wayser and Brian J. Tanada, for Defendant and Respondent.

Plaintiff Bunker Hill Park Limited ("Bunker Hill") filed a petition to compel arbitration with its tenant, defendant U.S. Bank National Association ("U.S. Bank"), to resolve the parties' disagreement over whether subleases automatically terminate if the underlying lease between Bunker Hill and U.S. Bank terminates. The trial court denied the petition on the grounds that the parties' disagreement had not ripened into a justiciable controversy meriting declaratory relief. Bunker Hill timely appealed. For the reasons stated below, we reverse and remand with directions to grant the petition.

**FACTUAL AND PROCEDURAL BACKGROUND**

The facts underlying this appeal are not in dispute. The parties are successors-in-interest to a 99-year ground lease governing a parcel of land located at 201-281 South Figueroa Street in downtown Los Angeles. Landlord Bunker Hill owns the land, and tenant U.S. Bank owns the five low-rise office buildings and other improvements erected on the parcel until the lease expires in 2077 or is terminated, at which point the improvements become the property of Bunker Hill. Bunker Hill may terminate the ground lease only if U.S. Bank defaults. U.S. Bank, on the other hand, may terminate the ground lease at any time so long as it provides Bunker Hill with 60 days' advance notice. U.S. Bank also is permitted to assign its interest in the ground lease and to sublet the property. U.S. Bank has exercised the latter right.

The ground lease requires U.S. Bank to pay an annual "basic net rent," the amount of which is to be adjusted in April 2013 and April 2045. The parties were unable to agree on the proper amount of the April 2013 adjustment. Pursuant to an arbitration provision contained in an amendment to the ground lease that requires arbitration of "[a]ny and all disputes, controversies, or claims arising under or relating to the Ground Lease, this Amendment, . . . or the enforcement of the provisions thereunder or the determination of the Parties' rights and obligations thereunder, including but not limited to any unlawful detainer actions, the subject matter of the Complaint and/or the subject matter of the

2

Cross-Complaint." The parties arbitrated their dispute over the basic net rent in December 2013.

During the course of that arbitration, Bunker Hill argued that the basic net rent should reflect the value of the land at its highest and best use, which its expert opined was not hosting a low-rise office complex but rather housing a mixed-use or residential development. U.S. Bank retorted that no redevelopment of the property could be pursued in the near future because it had entered into various lengthy subleases that could not be terminated prematurely. U.S. Bank further argued that Bunker Hill would take title subject to the subleases in the event that the ground lease terminated before its 2077 expiration. Bunker Hill maintained that the subleases would terminate concurrently with any termination of the ground lease.

The arbitrator made no mention of subleases or their fate upon termination of the ground lease in his January 31, 2014, arbitration award.[1] The parties nevertheless continued discussing these issues. On February 14, 2014, Bunker Hill sent a letter to U.S. Bank. The letter reaffirmed Bunker Hill's position that any subleases would terminate along with the ground lease and requested that Bunker Hill's views on the subject "be made clear to the property manager, leasing agent, subtenants, and any broker that [U.S. Bank] may engage, so as to minimize the likelihood of confusion or problems with subtenants or assignees." U.S. Bank responded by letter dated February 24, 2014. "As for the substantive issue about whether [Bunker Hill] is bound by the subleases," U.S. Bank stated that it "cannot agree simply to disagree on the issue" because in its view Bunker Hill's stance "effectively makes the property un-leaseable and unsellable and U.S. Bank believes that [Bunker Hill] is attempting to interfere improperly with U.S. Bank's actual and prospective economic advantage and contractual rights." Accordingly,

---

[1] The award increased the basic net rent by approximately 1200%. This sizeable escalation is substantially less than the approximately 1800% bump Bunker Hill sought. U.S. Bank asserts that it "currently pays rent to Bunker Hill in accordance with the award."

3

U.S. Bank invoked the ground lease's arbitration provision and "demand[ed] binding arbitration on the issue."

Bunker Hill acceded to the demand and the parties began moving toward arbitration pursuant to the expedited schedule set forth in the arbitration provision. Bunker Hill proposed three potential arbitrators on March 19, 2014, and the parties engaged in a back-and-forth exchange regarding their preferences before agreeing on an arbitrator on March 26, 2014, the final day of the 30-day selection period set forth in the arbitration provision. Counsel for U.S. Bank proposed a draft arbitration agreement on March 25, 2014, which counsel for Bunker Hill "[took] the liberty of revising" on April 2, 2014. Also on April 2, counsel for Bunker Hill contacted the arbitration agency to reserve an arbitration date of May 30, 2014, the earliest date on which the selected arbitrator was available. Counsel for U.S. Bank requested that Bunker Hill hold off on submitting the $400 case management fee to the arbitration agency, however, so that he could "confer" with U.S. Bank "on several issues."

By April 8, 2014, Bunker Hill had not heard back from U.S. Bank. U.S. Bank's silence prompted "some concern on [Bunker Hill's] end," as it feared that U.S. Bank "may be having reservations about proceeding with an arbitration on the sublease issue at this time." In a letter dated April 8, 2014, Bunker Hill informed U.S. Bank that "[i]t is important to [Bunker Hill] that the issue that [U.S. Bank] has raised relating to the subleases be determined expeditiously." By the same letter, Bunker Hill "formally request[ed] . . . an arbitration on the sublease issue." It also expressed a willingness to work with U.S. Bank to finalize the arbitration agreement and to consider an alternative schedule if necessary.

U.S. Bank responded by letter dated April 16, 2014. In that letter, U.S. Bank "acknowledge[d] the request of Bunker Hill . . . set forth in its February 14, 2014 letter, that U.S. Bank take into account [Bunker Hill's] position that subleases are not binding upon [Bunker Hill] upon any termination of the subject ground lease" and agreed to "take that position into account." U.S. Bank further "acknowledge[d]" Bunker Hill's request

4

that its position on subleases "be made clear to the property manager, leasing agent, subtenants, and any broker that [U.S. Bank] may engage," and stated that it would "provide the appropriate notifications at the appropriate times to the appropriate parties." In light of these acknowledgments, U.S. Bank advised Bunker Hill that it "d[id] not see the need at this point to proceed with a new arbitration on this issue."

Bunker Hill responded with a letter dated April 17, 2014. It advised U.S. Bank that "it is unclear exactly what notices U.S. Bank is offering to provide, when the notices will be provided, and to whom they will be provided." Bunker Hill further asserted that "in any case, such notices will not resolve the dispute and will thus be insufficient to eliminate the possibility that there will be litigation or an arbitration with successors to U.S. Bank's interest in the ground lease or subtenants." Bunker Hill also opined that "the uncertainty that will remain until the issue relating to the effect of a termination of the ground lease is resolved will adversely impact [Bunker Hill]'s interest in the property in question." Bunker Hill therefore reiterated its intention to "proceed with the arbitration" and expressed "hope that U.S. Bank will cooperate . . . in scheduling the arbitration and complying with the related requirements in the [arbitration provision]." Bunker Hill also enclosed another copy of the April 2, 2014, draft of the arbitration agreement for U.S. Bank to review.

U.S. Bank responded via email dated April 22, 2014. It contended that both of Bunker Hill's reasons for moving forward with the arbitration were "based on the faulty premise that there will be an early termination of the ground lease before its termination in 2077." U.S. Bank went on to explain that it "has provided no indication, nor is there any independent basis to conclude, that there will be an early termination of the ground lease. We thus fail to see the need for arbitration of an issue based on the possibility of a future event (early termination of the ground lease) that is purely hypothetical in nature." U.S. Bank also reiterated its April 16, 2014, contention that its agreement to provide notice of Bunker Hill's position to subtenants "further evidences that there is no live dispute to be arbitrated." U.S. Bank acknowledged that Bunker Hill had the right to

5

petition to compel arbitration, but advised Bunker Hill that if it did so, "we would ask the Court to send any arbitration (if the petition is granted) to Mr. Chernick [the arbitrator who resolved the net rent dispute], given his familiarity with the property."[2] U.S. Bank further "reserve[d] the right to ask Mr. Chernick, or any other arbitrator, to reopen the prior proceeding to consider lowering the basic net rent set by Mr. Chernick in light of Bunker Hill's post arbitration conduct, which we believe adversely impacts the basic net rent analysis conducted by Judge Chernick."

Bunker Hill responded on April 25, 2014. In its email, Bunker Hill set forth the reasons why it believed that "[t]he dispute needs to be resolved promptly," namely "the threats that [U.S. Bank] has made; the impact of the dispute remaining unresolved on [Bunker Hill]'s property interests; the absence of an agreement on exactly what disclosures should be made, when they should be made, or to whom they should be made; and the fact that merely disclosing the dispute to potential purchasers and subtenants will not eliminate the uncertainty or impact, resolve the dispute, or eliminate the possibility of future litigation." Bunker Hill advised U.S. Bank that it planned to file a petition to compel arbitration later in the day.

Bunker Hill followed through on its promise to file a petition to compel arbitration on April 25, 2014. Bunker Hill provided the court with the arbitration provision, two of the letters the parties had exchanged concerning arbitration, a declaration from one of its attorneys, and the following explanation of the disagreement: "There is presently a dispute between BHPL [Bunker Hill] and U.S. Bank regarding their respective rights and obligations under the Ground Lease (the 'Dispute'). Specifically, BHPL contends that, upon termination of the Ground Lease, any and all existing subleases, except those with respect to which a non-disturbance agreement has been executed by BHPL and an attornment agreement has been executed by the subtenant, will be automatically terminated. BHPL is informed and believes, and on that basis alleges, that U.S. Bank

---

[2] Mr. Chernick was not the arbitrator the parties agreed upon to arbitrate the sublease issue. It is unclear whether he was even among those proposed.

disputes BHPL's contention and, in particular, contends that each sublease will remain in place throughout its term, and that BHPL will be required to fulfill U.S. Bank's obligations under each sublease, regardless of the termination of the Ground Lease and regardless of whether BHPL has agreed that it will not disturb said sublease. BHPL disputes this contention." In the memorandum of points and authorities accompanying its petition, Bunker Hill argued that the parties' disagreement was a "controversy" within the meaning of Code of Civil Procedure, section 1280, subdivision (c),[3] and that it was entitled to an order compelling arbitration under section 1281.2 because it satisfied the statutory criteria and none of the three exceptions set forth in that statute was applicable to the instant case.

U.S. Bank opposed the petition on the grounds that Bunker Hill failed to "allege facts demonstrating the existence of an actual arbitrable controversy." U.S. Bank contended that Bunker Hill improperly was "asking for arbitration about a hypothetical– whether the subleases are binding in the event that the ground lease ever terminates early at some point in the future," and seeking "an advisory opinion about a hypothetical event." U.S. Bank analogized the disagreement to "a request for declaratory relief regarding potential future rights dependent on events that are highly unlikely to occur," and argued that "declaratory relief about future potential rights based on events that have not yet happened and may never happen is not appropriate under these circumstances." It further argued that arbitration was inappropriate for the additional reason that "it is the subtenants whose rights will be impacted by any arbitration ruling [, b]ut they are not parties to the ground lease or its arbitration provision and would not be parties to any arbitration compelled by this Court."

In its reply, Bunker Hill argued that "the dispute identified in BHPL's petition is arbitrable under Code Civ. Proc. §§ 1280, 1281, and 1060 because it concerns a 'question' or 'disagreement' between the parties as to the consequences of a termination

---

[3]     All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

of the ground lease and as to which declaratory relief is available." Bunker Hill also attempted to distinguish the cases U.S. Bank relied upon, and reiterated its contention that the only bases for denying the petition were those set forth in section 1281.2.

In its order resolving the matter, the trial court recognized the strong public policy in favor of arbitration and the presumption in favor of arbitrability. It also noted that section 1281.2 requires the enforcement of arbitration agreements "unless one of three limited exceptions applies": "(1) a party waives the right to arbitration; (2) grounds exist for revoking the arbitration agreement; and (3) pending litigation with a third party creates the possibility of conflicting rulings on common factual or legal issues." (*Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 967.) Without addressing whether any of these exceptions applied, the court denied the petition on the grounds that "the issue of the effect of the termination of the ground lease on the subleases is not sufficiently crystallized such that declaratory relief is appropriate." The court, which characterized the question presented as "whether the respective parties' 'dispute' over the effect of termination of the ground lease on the subleases presents an 'actual controversy,' i.e., is ripe (as Petitioner contends), or whether adjudication of the 'dispute' would be tantamount to rendering an advisory opinion (as Respondent contends)," concluded that no actual controversy existed between the parties. The trial court added that it was "also troubled by the lack of input or notice to the sublessees who might be directly affected by a ruling in support of the request being made by Petitioner, Bunker Hill." It noted that the denial of the petition was without prejudice to refiling "after termination of the subject ground lease, should such event ever take place." Bunker Hill timely appealed pursuant to section 1294, subdivision (a).

## DISCUSSION

### I.     Standard of Review

"There is no uniform standard of review for evaluating an order denying a motion to compel arbitration." (*Robertson v. Health Net of California* (2005) 132 Cal.App.4th 1419, 1425.) "If the court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's decision rests solely on a decision of law, then a de novo standard of review is employed." (*Ibid.*) The abuse of discretion standard also is applied in some cases, generally those in which the denial is based upon section 1281.2, subdivision (c). (*Lindemann v. Hume* (2012) 204 Cal.App.4th 556, 565.) Bunker Hill advocates for the de novo standard because the pertinent facts are undisputed and no extrinsic evidence is in play. (See, e.g., *Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 60 (*Avery*) ["Interpreting a written document to determine whether it is an enforceable arbitration agreement is a question of law subject to de novo review when the parties do not offer conflicting extrinsic evidence regarding the document's meaning."].) U.S. Bank contends that the "more generous abuse of discretion standard" is applicable because (1) "the trial court denied the Petition due to Bunker Hill's failure to allege specific facts showing entitlement to declaratory relief," and (2) "analyzing the Petition requires the court to determine whether declaratory relief is ripe." U.S. Bank also contends that "[r]egardless of which standard applies, the trial court's ruling was proper and should be affirmed in all respects."

We conclude that the de novo standard of review is the appropriate one to apply here. The trial court's decision rested on its conclusion that the petition failed to present an actual controversy sufficiently ripe for adjudication. Whether this decision was based upon the court's interpretation of the parties' arbitration agreement, its application of section 1060, section 1280, subdivision (c),[4] or some combination of those two

---

[4]     Section 1060 sets forth the conditions under which a party may file an action for declaratory relief. One of the criteria is that there must be an "actual controversy relating

9

provisions, or simply a general determination that the action was unripe, it was a legal decision that must be examined anew.  (*Avery*, *supra*, 218 Cal.App.4th at p. 60; *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1582; *American Meat Institute v. Leeman* (2009) 180 Cal.App.4th 728, 741; *Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524, 529.)  Accordingly, in the course of our analysis, we may consider legal arguments that were not raised below.  (E.g., *Cal Sierra Construction, Inc. v. Comerica Bank* (2012) 206 Cal.App.4th 841, 851.)

## II.   Analysis

Our legislature "has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.'"  (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9.)  Consequently, it has enacted statutes specifically authorizing parties to enter arbitration agreements "to avoid the judicial forum altogether" (*Grafton Partners v. Superior Court* (2005) 36 Cal.4th 944, 955; § 1281) and limiting the circumstances under which a court properly may decline to compel arbitration once it determines that a valid "agreement to arbitrate a controversy" exists (§ 1281.2).  In accordance with this policy, courts have taken the statutory scheme at face value and "decline[d] to read additional unwritten procedural requirements, such as actual notice and meaningful reflection, into the arbitration statute."  (*Pinnacle Museum Tower Association v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 245.)  Likewise, courts implement the strong public policy favoring arbitration when determining whether a valid arbitration agreement exists and whether a particular disagreement lies within its scope by resolving doubts concerning the scope of arbitrable issues in favor of arbitration.  (*Wagner Construction Co. v. Pacific Mechanical Corp.* (2007) 41 Cal.4th 19, 26.)  Indeed, the general rule is that "arbitration should be upheld 'unless it can be said with assurance that an arbitration clause is not susceptible to an

---

to the legal rights and duties of the respective parties."  Section 1280 subdivision (c), defines "controversy" for purposes of the title of the Code of Civil Procedure governing arbitration.

interpretation covering the asserted dispute. [Citation.]'" (*Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 686.)

Here, the trial court appears to have concluded that the arbitration provision at issue does not cover the parties' disagreement over subleases because that disagreement is not a ripe controversy under either or both section 1280, subdivision (c), and section 1060. Ripeness, of course, is required in a judicial forum. "[T]he proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion"; "judicial decision-making is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170.) Neither Bunker Hill nor U.S. Bank has pointed us to any authority squarely indicating that the same restriction necessarily applies in an arbitral forum, and we are not persuaded that it does. (Cf. *Gueyffier v. Ann Summers, Ltd.* (2008) 43 Cal.4th 1179, 1186 ["In any event, whether a California *trial court* properly could have excused the notice-and-cure condition in the circumstances of this case is not at issue here. The parties chose to resolve their dispute not in court but by private arbitration."].)

Arbitration is foremost a creature of contract. (See, e.g., *Rebolledo v. Tilly's, Inc.* (2014) 228 Cal.App.4th 900, 912-913.) "Arbitration's consensual nature allows the parties to structure their arbitration agreements as they see fit. They may limit the issues to be arbitrated, specify the rules and procedures under which they will arbitrate, designate who will serve as their arbitrator(s), and limit with whom they will arbitrate." (*Network Capital Funding Corporation v. Papke* (2014) 230 Cal.App.4th 503, 509.) Contracting parties also are free to negotiate and restrict the powers of an arbitrator and the universe of issues that he or she may resolve; "[t]he powers of an arbitrator derive from, and are limited by, the agreement to arbitrate." (*Gueyffier*, *supra*, 43 Cal.4th at p. 1185.) "As for the requirement that there exist a controversy, it is sufficient the parties *contractually* have agreed to resort to a third party to resolve a particular issue."

(*Coopers & Lybrand*, *supra*, 212 Cal.App.3d at p. 534 [emphasis in original].)  "The limited function reserved to the courts in ruling on an application for arbitration is not whether the claim has merit, but whether on its face the claim is covered by the contract." (*Amalgamated Transit Union v. San Diego Transit Corp.* (1979) 98 Cal.App.3d 874, 879.)  Thus, we look to the terms of the parties' contract to ascertain whether they agreed to arbitrate a particular disagreement or to restrict the arbitrator to resolving certain issues.  (See *Rebolledo*, *supra*, 228 Cal.App.4th at pp. 912-913.)  Per the ground lease, "[i]n all cases the language in all parts of th[e] Lease shall be construed simply, according to its fair meaning and not strictly for or against Landlord or Tenant."

Here, the parties, both of whom are sophisticated business entities, agreed to a broadly worded arbitration provision that obligates them to arbitrate "[a]ny and all disputes, controversies or claims arising under or relating to the Ground Lease."  The parties do not argue that the putative ripeness requirement derives from this language, and we agree with their implicit concession that it does not.  Moreover, we decline to read an unwritten justiciability requirement into the arbitration provision the parties bargained for and negotiated.  The expansive arbitration provision does not on its face limit the universe of arbitrable disagreements to those that are "ripe."  Unlike some arbitration provisions that explicitly apply only to disputes that are "justiciable under applicable state or federal law" (See, e.g., *Cunningham v. Leslie's Poolmart, Inc.* (C.D. Cal. June 25, 2013) No. CV 13-2122 2013 U.S. Dist. Lexis 90256, at p.1; *Rent-A-Center, Inc. v. Iowa Civil Rights Commission* (Iowa 2014) 843 N.W.2d 727, 728), the arbitration provision in this case is devoid of any such limiting language.  It is not our place to "insert what has been omitted" (§ 1858), particularly absent some indication that the parties understood or intended "[a]ny and all disputes, controversies or claims," standing alone, to exclude claims that may not be strictly "justiciable" from the ambit of the arbitration provision.  (See Civil Code, § 1639.)

Neither the arbitration provision nor the ground lease it amended specially defines "any," "all," "dispute," "controversy," or "claim."  "Unless given some special meaning

12

by the parties, the words of a contract are to be understood in their 'ordinary and popular sense,' focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made." (*City of Bell v. Superior Court* (2013) 220 Cal.App.4th 236, 248; see also § 1861; Civil Code, § 1644.) The phrase "any and all" undoubtedly is usually and ordinarily understood to be expansive and all-encompassing. "From the earliest days of statehood the courts have interpreted 'any' to be broad, general, and all embracing." (*Burnsed v. State Board of Control* (1987) 189 Cal.App.3d 213, 217.) The definitions of "disputes," "controversies," and, to a lesser extent, "claims" contained in legal and lay dictionaries, to which this court may "appropriately refer" when attempting to ascertain the ordinary meaning of a word, further suggest that the language used by the parties encompasses both legally justiciable and non-justiciable disputes. (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1122; Webster's New World Dict. (3d college ed. 1991) pp.73, 257, 303, 396; Black's Law Dict. (9th ed. 2009) pp. 281, 379, 540.)

The parties did expressly provide that select portions of the Code of Civil Procedure would apply to the arbitration of certain matters: ("If the dispute relates to a dispute over Tenant's alleged non-payment of a Basic Net Rent or Additional Rent, . . . the Parties shall be entitled to all remedies and procedures under Chapter Four of the California[ ] Code of Civil Procedure, including but not limited to the expedited procedures set forth therein. . . .") This demonstrates the parties' recognition that, absent some clear directive, procedural rules applicable by default in a court of law would not necessarily apply in an arbitral setting. Yet there is no evidence that they sought to ensure that unwritten rules of justiciability would carry over into any arbitration they might have. Indeed, as noted above, neither side ever has suggested that the parties' arbitration provision is the source of the bar on arbitrating the disagreement at issue. The trial court appears to have concluded that the sublease issue fell within the broad scope of the arbitration provision but could not be arbitrated due to justiciability constraints imposed by some extratextual source. To the extent that this source is the Code of Civil

13

Procedure, we are not convinced that the provisions cited by the trial court and the parties operate to impose any such justiciability restriction.[5]

The statutory definition of "controversy" for purposes of the statutes governing arbitration is very broad: "'any question arising between parties to an agreement whether such question is one of law or of fact or both.' (§ 1280, subd. (c)"; *Coopers & Lybrand*, *supra*, 212 Cal.App.3d at p. 534, fn. 5.) As noted above, we have interpreted section 1280, subdivision (c), expansively, clarifying that "[a]s for the requirement that there exist a controversy, it is sufficient the parties *contractually* have agreed to resort to a third party to resolve a particular issue." (*Coopers & Lybrand*, *supra*, 212 Cal.App.3d at p. 534 [emphasis in original].) Here, the parties' unfettered arbitration provision plainly encompasses the particular issue of sublease termination, an unresolved dispute which both arises under and relates to the ground lease. U.S. Bank cannot plausibly contend that the provision does not reach the particular issue of sublease termination when it was the party that originally demanded arbitration of the issue in the first place. Thus, we are satisfied that the requisite "controversy" is present here.

U.S. Bank does not dispute this. Instead, evidently building on its earlier analogy likening the instant dispute to "a request for declaratory relief regarding potential future rights dependent on events that are highly unlikely to occur" and Bunker Hill's invocation of section 1060 in its reply below, U.S. Bank argues that no "*actual* controversy" exists and Bunker Hill therefore cannot seek declaratory relief under section 1060. That might be accurate if Bunker Hill had filed an action seeking declaratory

---

**5**    This is not contrary to *Graphic Arts International Union v. Oakland National Engraving Co.* (1986) 185 Cal.App.3d 775, 782-783, which held that parties seeking to compel arbitration must provide the court with a statement of facts "as would be required in any civil action" by section 425.10. The rationale behind the holding in *Graphic Arts* was to ensure that courts ruling on petitions to compel arbitration were not "required to engage in guesswork as to what the issues are." (*Graphic Arts*, *supra*, 185 Cal.App.3d at p.783.) Here, the parties agree what the salient issues are, and Bunker Hill pleaded them clearly in any event. The question presented is whether these issues constitute an arbitrable "controversy."

14

relief.  But U.S. Bank does not explain how or why a petition to compel arbitration must satisfy the statutory requirements imposed upon claims for declaratory relief. [6]  Nor did the trial court.  There is no doubt that the relief Bunker Hill ultimately seeks is declaratory in nature.  But a petition to compel arbitration is, consistent with the contractual nature of arbitration, "'simply a suit in equity seeking specific performance of that contract.'"  (*Rebodello*, *supra*, 228 Cal.App.4th at p. 912; *Freeman v. State Farm Mutual Automobile Insurance Co.* (1975) 14 Cal.3d 473, 479.)  A petition to compel arbitration is a separate proceeding, distinct from the claims it relates, which "states a separate cause of action subject to its own limitation period."  (*Wagner Construction Co. v. Pacific Mechanical Corp.*, *supra*, 41 Cal.4th at p. 29.)

In the instant case, that means that the petition to compel arbitration is distinct from Bunker Hill's underlying request for declaratory relief.  We accordingly find it irrelevant whether the petition to compel arbitration articulates an "actual controversy" that could support an award for declaratory relief under section 1060.  (Cf. § 1281.2 ["If the court determines that a written agreement to arbitrate a controversy exists, an order to arbitrate such controversy may not be refused on the ground that the petitioner's contentions lack substantive merit."]; *Wagner*, *supra*, 41 Cal.4th at p. 26 [holding that a court may not deny a petition to compel arbitration on the ground that the statute of limitations has run on the claims the parties agreed to arbitrate].)  Whether compelling arbitration is "necessary or proper at the time under all the circumstances" (§ 1061) is an equally inapposite consideration, as is the possibility that U.S. Bank will foment additional litigation.

For purposes of section 1281.2, the statute that expressly governs petitions to compel arbitration, all a petitioner is required to show before arbitration "shall" be

---

[6]     We need not and do not determine whether the sublease issue constitutes an "actual controversy" within the meaning of section 1060, or even whether it is "ripe" or otherwise justiciable in a judicial forum. In light of the statutory framework governing arbitration and the expansive language of the parties' arbitration provision, the ripeness of the parties' dispute is not pertinent to our resolution of this matter.

15

ordered is the existence of a valid agreement to arbitrate the issue underlying the petition and the opposing party's refusal to arbitrate the controversy. (§ 1281.2; *Coast Plaza Doctors Hospital*, *supra*, 83 Cal.App.4th at p. 687.) Because Bunker Hill made those showings here, and there is no indication that any of the three narrow exceptions apply (see § 1281.2, subds. (a)-(c)), the trial court erred in denying the petition to compel arbitration in this case.

In so holding, we note that we find nothing unjust or unreasonable in enforcing the arbitration provision against U.S. Bank in this case. (See Civ. Code, § 3391.) U.S. Bank's sophisticated predecessor-in-interest negotiated the broadly written arbitration provision with Bunker Hill, and there is no indication that U.S. Bank has any quarrel with the provision or has sought to renegotiate it. We acknowledge U.S. Bank's concern that it may "make[ ] little sense to spend time and resources arbitrating a dispute that is contingent on an event that may never occur," but the parties agreed to arbitrate "[a]ny and all disputes, controversies or claims arising under or relating to the Ground Lease," not merely those that meet the criteria for justiciability in a court of law. More importantly, U.S. Bank was the party that demanded arbitration of the sublease issue in the first instance and indeed is "contradicting itself by contesting the Petition." For these reasons, granting the petition to compel arbitration does not amount to "mak[ing] the arbitration process itself an offensive weapon in one party's arsenal[,]" *Saika v. Gold* (1996) 49 Cal.App.4th 1074, 1081, which we recognize could be a danger in cases where parties to a broadly worded arbitration agreement have asymmetric levels of bargaining power, sophistication, or legal resources and the stronger party seeks to compel arbitration of a dispute that might not otherwise be justiciable in a court of law. The statutory exception permitting courts to deny petitions to compel arbitration where it is shown that "[g]rounds exist for the revocation of the agreement" may protect against such concerns in such cases. (See § 1281.2, subd. (b).).

## DISPOSITION

The order denying the petition to compel arbitration is reversed with directions to the trial court to grant the petition. Bunker Hill is entitled to costs on appeal.

## CERTIFIED FOR PUBLICATION

COLLINS, J.

We concur:

WILLHITE, Acting P. J.

KRIEGLER, J*

---

* Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17